1819.

BRINCKER-
HOFF
v.
LANSING.

---

## BRINCKERHOFF and others *against* LANSING and others.

Where a prior incumbrancer witnesses a subsequent conveyance or mortgage, knowing its contents, and does not disclose his own incumbrance, but intentionally suffers the party dealing with his debtor to remain in ignorance, such prior incumbrancer will be postponed, or barred.

This rule, however, does not apply where the prior incumbrance is duly *registered*, for then the subsequent purchaser or mortgagee is charged with notice.

To affect the right of such prior incumbrancer, mere silence is not sufficient; there must be actual fraud charged and proved; such as false representations or denial, upon inquiry, or artful assurance of good title, or deceptive silence when information is asked. And the burden of the charge and proof of fraud lies on the purchaser or subsequent mortgagee.

B. executed a mortgage to *L.*, dated *September* 7th, 1802, with a *proviso* for the payment of fifteen hundred dollars, with interest, according to the condition of a certain bond executed by *B.* to *L.* of the same date; which bond was conditioned " to pay 1,500 dollars, with lawful interest, on or before the 7th of *March*, 1803, or keep *L.* harmless, and pay up the note endorsed by *L.* for *B.* in the *Farmers' Bank*, when the same should be called for." The note referred to in the bond was made payable in *fifty-six* days, and dis-

1819.

BRINCKER-
HOFF
v.
LANSING.

counted at the *Farmers' Bank*, for *B.*; and at the end of the fifty-six days was renewed by another note made and endorsed in the same manner, and so was continued to be renewed, *toties quoties*, for above nine years, the *calls* of the bank being from time to time paid by *B.*, and the note reduced, at various times, to 900, 700, 600, and 400 dollars, and again raised, on subsequent renewals, to 1,000 dollars, and 1,300 dollars, until *October* 8th, 1811, when the last note so given in renewal, and endorsed by *L.*, being 720 dollars, was protested for non-payment, *B.* having become insolvent, and *L.*, as endorser, was compelled to pay the note : *Held*, that the bond of *B.* being intended as an indemnity against the debt due to the bank, originally created by the loan on the note for 1,500 dollars, so long as that note should continue, under the customary renewals at the bank, the mortgage remained a valid security for such debt, so kept alive in the bank, in whole or in part, by these customary renewals, during all that period, and for the sum of 720 dollars, being the amount of the last note so made and endorsed by the parties, and discounted by the bank; as the mortgage, with a reference to the bond, was sufficient to apprise a subsequent purchaser or mortgagor of the nature of the debt secured.

On a bill to redeem, further time is not usually given for the payment of the money.

And where a bill is filed by several persons, as owners of the equity of redemption in the property mortgaged, in different proportions, the proceedings of the mortgagee under a power of sale contained in the mortgage, will not be suspended or delayed, until the plaintiffs have settled the question as to the rateable proportion which each of them is to *contribute* towards the redemption.

But if the plaintiffs pay into Court the mortgage debt, with the interest and costs, the suit may be retained, for a reasonable time, to enable them to proceed against one of the defendants, who had, also, an interest in the equity of redemption, to compel him to contribute his proportion of such debt and interest.

*July 19th.*

THE bill, which was filed the 4th of *February*, 1812, by *John Brinckerhoff*, *Nathan Morey*, and *Aaron Wilcox*, against *Levinus Lansing*, *Otis Bates*, and *James Adams*, stated, that *Russel Forsyth* obtained a judgment against the defendant, *Bates*, on the 5th of *December*, 1810; and that by virtue of a *fi. fa.* issued thereon, a house and lot in *Lansingburgh*, was sold to the plaintiff *B.* for 1,100 dollars, and

a deed accordingly executed to him by the sheriff, dated December 14, 1811. That the plaintiff *B.*, and *G. H. Van Wagenen*, recovered a judgment against the defendant *Bates*, on the 28th of *January*, 1811 ; and in order to secure this debt in part, the plaintiff *B.* made the purchase above mentioned, at the sheriff's sale. That the defendant *Bates*, pretending to be seised of the lot in *L.*, on the 20th of *March*, 1811, sold and conveyed the same, in fee, to *Clarke Bates*, who, on the 2d of *January*, 1812, sold and conveyed the same to the plaintiff *Wilcox*. That the defendant *Bates*, on the 5th of *June*, 1804, leased a lot in *Lansingburgh* to *John Morey*, for sixteen years, the execution of which lease was witnessed by the defendants *Lansing* and *Adams*, who were acquainted with its contents. That *J. L. Lansing*, son of the defendant *L.*, on the 8th of *June*, 1804, leased the said lot to *John Morey*, for ever, and the execution of the lease was witnessed by the defendants *L.* and *A.*, who knew of its contents. That *Charles Morey, David M.*, and the plaintiff *N. M.* obtained a judgment on the 9th of *February*, 1810 ; and under an execution on that judgment, the sheriff sold the lot, last mentioned, to the plaintiff *N. Morey*. That on the 3d of *April*, 1806, a judgment, by confession, was entered up against the defendant *Bates*, in favour of the defendant *Lansing*, to indemnify him, as endorser of the notes of the defendant *B.*, and which notes were, afterwards, discharged. That on the 7th of *September*, 1802, the defendant *Bates*, executed a mortgage to the defendant *Lansing*, of two pieces of land, in *Lansingburgh*, to secure the payment of a bond of the same date, conditioned, as appeared from the evidence, "to pay 1,500 dollars, with lawful interest, on or before the 7th of *March*, 1803, or keep the said *L.* harmless, and pay up the note endorsed by the said *L.*, for the said *B.*, in the *Farmers' Bank*, when the same should be called for," and which mortgage, it appeared, was duly registered the 7th of *September*, 1802. That the lots purchased by the plaintiffs *B.* and *M.*, as above mentioned,

were part of the mortgaged premises. That a judgment, by confession, was entered up on the 11th of *July*, 1811, in favour of the defendant *L.*, against the defendant *Bates*, and by virtue of a *fi. fa.* issued thereon, the personal estate of *B.* and the residue of the mortgaged premises, not owned by the plaintiffs, were purchased by the defendant *Adams.* That the defendant *L.*, without reviving the judgment first above mentioned, sued out a *fi. fa.*, which was levied on the lands so owned by the plaintiffs *B.* and *W.*, and had also advertised them for sale, under the mortgage, with intent to force the plaintiffs *B.* and *W.*, to satisfy the mortgage. That if any thing is due on the mortgage, it ought to be paid to the plaintiffs *B.* and *M.*, and to the defendant *A.* rateably. The bill sought a discovery of the notes for the indemnity against which the mortgage was given; and *prayed* for general relief, and that the defendants be *enjoined* from selling the premises under the *fi. fa.*, or under the *power* contained in the mortgage, &c.

From the answer of the defendants *B.* and *L.*, and the evidence taken in the cause, it appeared that the note endorsed by the defendant *L.*, and as indemnity against which the bond and mortgage was given by *B.*, was dated the 7th of *September*, 1802, payable in *fifty-six* days, and discounted at the *Farmers' Bank*, for the defendant *B.* When the note fell due, it was taken up by a new note, drawn and endorsed by the same parties; and the note was so renewed, at the end of every 56 days, after having the *calls* of the bank paid by *B.* until the 24th of *January*, 1804, when the note was reduced to 770 dollars; that the note was, afterwards, raised to 990 dollars, and again renewed, from time to time, and the *calls* paid, until the 24th of *June*, 1805, when it was reduced to 400 dollars. It was then raised to 1,000 dollars, and regularly renewed, and the *calls* paid, from time to time, until the 17th of *October*, 1805, when it was reduced to 900 dollars. It was then raised to 1,300 dollars, and, afterwards, regularly renewed, and the calls paid, until the 8th of *Janu-*

*ary*, 1807, when it was reduced to 670 dollars. It was then raised to 1,000 dollars, and regularly renewed, and the calls paid, until *December* 8, 1807, when it was reduced to 720 dollars; and, in like manner, was, from time to time, renewed, the amount being, at one time, raised, but not above the original sum, and, at another, reduced, until the 8th of *October*, 1811, when, being then reduced to 720 dollars, it was protested for non-payment, the defendant *B.*, having then become insolvent; and the note was taken up by the note of the defendant *L.*, endorsed by the defendant *A.*

The cause was argued by *Henry*, for the plaintiffs, and by *Van Vechten*, and *T. Sedgwick*, for the defendants.

The cause stood over for consideration until this day.

THE CHANCELLOR. The claims of the three plaintiffs are entirely separate from each other, and rest on distinct grounds.

1. The plaintiff *Wilcox*, claims as a purchaser under the defendant *Bates*, and seeks to be relieved from the operation of a judgment of 1806, against *Bates*, in favour of the defendant *Lansing*. The counsel for the defendant *Lansing*, admitted, at the hearing, that the judgment complained of was satisfied; consequently, the plaintiff *Wilcox*, is entitled to the relief sought by the bill, and to have the defendant *Lansing*, perpetually enjoined from any proceeding upon that judgment. The plaintiff *Brinckerhoff* also seeks the same relief, and is entitled to the same remedy, in respect to that judgment.

2. The plaintiff *Morey*, claims title to a lot in *Lansingburgh*, under a purchase upon execution against *John Morey*, who held under a lease of the defendant *Bates*, given in 1804, and he seeks to be relieved against the operation of a mortgage covering the same lot, and given by *Bates* to the defendant *Lansing* in 1802.

1819.

BRINCKER-
HOFF
v.
LANSING.

*July 2d.*

*July 19th.*

Perpetual injunction against any proceeding on a judgment which had been satisfied.

**1819.**

BRINCKER-
HOFF
v.
LANSING.

The plaintiff *Morey* makes an objection to the mortgage which is peculiar to his case. When the defendant *Bates* leased the lot to *John Morey* in 1804, the defendant *Lansing* was a subscribing witness to the execution of the lease, and with knowledge of its contents. The lease was for only a part of the lands covered by the mortgage then held by *Lansing* against *Bates*, and it was for the term of sixteen years, at the annual rent of 12 dollars and 50 cents.

*If a prior incumbrancer witness a subsequent conveyance or incumbrance, knowing its contents, and does not disclose his own incumbrance, but intentionally suffers the party to remain in ignorance, he shall be postponed, or barred.*

It is contended, that this fact brings the case within reach of the principle, that if a prior incumbrancer be a witness to a subsequent conveyance or incumbrance, and knowing of its contents, does not disclose the fact of his own incumbrance, but intentionally suffers the party dealing with his debtor to remain in ignorance, he shall have his incumbrance postponed or barred, because he is thereby auxiliary to an act of fraud. (*Hobbs* v. *Norton*, 1 *Vern.* 136. *Hunsden* v. *Cheyney*, 2 *Vern.* 150. *Mocatta* v. *Murgatroyd*, 1 *P. Wms.* 393. *Becket* v. *Cordley*, 1 *Bro.* 357.)

The only question here is, whether the doctrine applies to the case.

*But if there is a registry of a mortgage, it is notice to all subsequent purchasers and mortgagees; and there must be proof of intentional fraud to postpone or bar the mortgagee.*

The mortgage from *Bates* to *Lansing* was, at the time, duly registered; and it is the settled rule of construction under our registry act, that the registry is notice of the mortgage to all subsequent purchasers and mortgagees, and they are chargeable with all the consequences of such notice. (*Johnson* v. *Stagg*, 2 *Johns. Rep.* 510. *Frost* v. *Beekman*, 1 *Johns. Ch. Rep.* 298. *Parkist* v. *Alexander*, 1 *Johns. Ch. Rep.* 389.) The law will, therefore, intend, that *John Morey* had notice of the prior registered mortgage when he took the lease from *Bates*, and that the plaintiff *Morey* had the like notice when he purchased, upon execution, the title of *John Morey*; and it would require direct and satisfactory proof of intentional deception and fraud, on the part of *Lansing*, before he can be postponed to a subsequent purchaser.

The fact, that the lease which he attested, was for a part only of the mortgaged premises, and for a term of years, does not afford a very strong inference of actual fraud, either on the part of *Bates* or *Lansing*. The remaining interest of *Bates* in the lot demised, and the residue of the mortgaged premises, may have been deemed by the parties a sufficient security for the mortgage debt. Intentional fraud upon *John Morey* does not seem to be a necessary conclusion. If no inquiry was made, (and none is charged,) *Lansing* might have presumed, what the law presumed, that his mortgage was well known to *Morey*, the lessee, by means of the registry. He had already made his mortgage known to the world, and if the purchaser did not choose to inquire of him, or to search the records, he had no just ground to complain.

It appears to me to be a fatal objection to this charge of fraud, that the bill itself does not contain any charge, that either *John Morey*, the lessee, or the plaintiff *Morey*, the purchaser under him, were ignorant of the mortgage, at the time of the purchase by them respectively; nor does the bill even charge that *Lansing*, at the time of his attestation, withheld the knowledge of the subsisting mortgage. There is no fraud or intentional deception at the time charged; and if the party sets up a title to relief in equity, on the ground of being a *bona fide* purchaser, he ought to deny notice in the most decided manner. If he will not aver, that he was a purchaser without actual notice, we are not ·bound to presume it, especially, since the law had given him notice by the registry of the mortgage. Whether he comes for relief in his character of an innocent and injured purchaser, as a plaintiff, or sets up that defence by plea, the rule requiring him to aver his claim fully and explicitly, and which rule has been often declared, (1 *Johns. Ch. Rep*. 302. 3 *Johns. Ch. Rep*. 345. and the cases there cited,) will equally apply. Under the circumstances of this case, a very explicit denial of notice was requisite on the

And if the subsequent purchaser, or mortgagee, seeks relief on the ground of actual fraud, or *intentional* deception, on the part of the first incumbrancer, he must clearly and pointedly *charge* such fraud or *intentional* concealment in his bill, and an explicit denial of all knowledge of the existence of the prior incumbrance.

1819.

BRINCKER-
HOFF
v.
LANSING.

part of the plaintiffs, and a most pointed charge of *inten-tional* concealment on the part of the defendant *Lansing*, if they meant to clothe themselves in their proper character as purchasers, and to succeed on the ground of actual fraud.

We have a precedent of what such a bill ought to contain, in the case of *Arnott* v. *Biscoe*, (1 *Ves.* 95. *Belt's Supp.* 67.) The bill there charged, that the party did not disclose the incumbrance, but averred that there was no incumbrance. The suit was to get rid of a purchase on the ground of a concealed incumbrance, and there was a charge of absolute fraud in the defendant.

The mere silence of a mortgagee who witnesses a subsequent purchase, or incumbrance, is not sufficient to affect his right, unless that silence was intentional, and for the purpose of deception; for where the pri- or in̶-cumbrance is registered, there must be actual fraud shown, as false representa-tions, or denial upon inquiry, or artful as-surances of good title, or deceptive si-lence, when information is asked, in order to postpone or bar the prior incumbrancer. And the bur-den of proving such fraud lies on the subse-quent purcha-ser.

The mere silence of a mortgagee, when he is present at the execution of a subsequent purchase or incumbrance, is not sufficient to affect his right, unless that silence was intentional, and for the purpose of deception. That inference is not to be drawn from silence alone, under the operation of our registry act. There must be active fraud charged and proved, such as false representations, or denial upon inquiry, or artful assurances of good title, or deceptive silence, when information is asked. The burden of the charge, and of the proof, lies upon the purchaser. He must make out the fraud, and the mortgagee is to be presumed innocent, until proved to be guilty. This is the true doctrine to be extracted from the cases, and it applies with accumulated force in cases like this, where the party has put his mortgage upon record, and given notice to the world.

The same objections, as to the charge of fraud, apply to another fact in the bill, viz : That a few days after the date of the lease from *Bates* to *Morey*, a son of the defendant *Lansing* leased the same lot to *Morey*, forever, and this lease was also witnessed by the defendant *Lansing*, with knowledge of its contents.

Why this last lease was taken, is wholly unexplained. But whatever might have been the reasons operating upon the parties to that lease, the simple attestation of it by *Lan-*

*sing* affords no better inference of a fraudulent design in this, than in the other case.

3. This case, then, turns wholly upon the question, whether the mortgage of 1802, from *Bates* to *Lansing*, was, at the time of filing the bill, to be deemed a valid subsisting mortgage for any part of the debt originally secured by it. In this question the plaintiffs *Brinckerhoff* and *Morey* are equally interested, for they both hold, by purchase under *Bates*, parts of the land covered by *Lansing's* mortgage.

It does not appear to me, that the claim under this mortgage ought to be affected by other transactions totally distinct from it; any fraudulent pretensions of *Lansing*, under either of his judgments, are not to destroy his rights under the mortgage; it must stand and be investigated upon its own merits.

There is no doubt of its having been a fair, valid mortgage in the beginning, and given to indemnify *Lansing*, as endorser of a note drawn by *Bates*, for 1,500 dollars. The only proper inquiry now is, has *Lansing* been injured, and is he entitled to any indemnity for the injury he received by means of that note?

The proviso in the mortgage was, that *Bates* was to pay to *Lansing* 1,500 dollars, with interest, " according to the condition of a certain bond, or writing obligatory, bearing even date therewith, executed by *Bates* to *Lansing*, as a collateral security." The bond here referred to was, according to the condition of it, " to pay 1,500 dollars, with lawful interest, on or before the 7th of *March*, 1803, or keep the defendant *L.* harmless, and pay up the note endorsed by the defendant *L.*, for the defendant *B.*, in the *Farmers' Bank*, when the same should be called for."

The note referred to, in the condition of the bond, was of the same date with the bond and mortgage, and was for 1,500 dollars, payable in fifty-six days, and discounted at the *Farmers' Bank*, in favour of *Bates*. It appears, by the

1819.

BRINCKER-
HOFF
v.
LANSING.

A mortgage given to secure a certain sum, according to the condition of a certain bond of the same date, and which bond was conditioned to pay that sum, or *indemnify* the mortgagee against a *note* for the same sum, made by the mortgagor, and endorsed by the mortgagee, and discounted at the Bank, for the accommodation of the mortgagor, will continue as a subsisting and valid security, as long as such note shall be *run*, or be kept alive in the bank, in whole or in part, by renewals thereof, from time to time, according to the customary course of such transactions with the Bank; such mortgage, with a reference to the bond, being sufficient to apprise a subsequent purchaser or mortgagee of the nature of the debt secured.

testimony of *L. I. Tillman*, that the note was renewed at the end of the fifty-six days, by a new note, made and endorsed in like manner, and so it continued to be renewed, *toties quoties*, for a number of years. The calls were all paid, from time to time, by *Bates*, and the sum was reduced gradually, at times, to 900 dollars, to 700 dollars, to 600 dollars, and, at one time, to 400 dollars, and then it was raised again, on the renewal, to 1,000 dollars, and at one time, to 1,300. The debt of 1802 was kept alive in the bank, by these constant renewals, and alternate variations in the sum, until the 8th of *October*, 1811, when the sum was reduced to 720 dollars, and the note then alive, and for that sum, was protested for non-payment. This catastrophe put a stop, according to the usual mercantile phrase, to *the running of the note in the bank*, and the defendant *Lansing*, as endorser, was obliged to take up and pay the note, which he did, by a note of his own, as drawer, endorsed by the defendant *Adams*.

I see no good reason why the bond and mortgage should not stand as an indemnity and security for the 720 dollars, which *Lansing* was thus obliged to pay.

The bond was intended as an indemnity against the bank debt, originally created by the loan upon the note for 1,500 dollars, so long as that bank debt should continue, under the customary renewals and fluctuations in the amount. The 1,500 dollars were, by the bond, made payable in six months; this fact shows that the parties contemplated a continuation of the debt beyond the fifty-six days, for which the original note was made payable. It was evidence of an expectation that the note was to be repeatedly renewed. The other part of the condition of the bond, that the defendant *Bates* was to pay the note in the bank " when the same should be called for," shows, also, the like expectation. Instead of fixing at the precise period when the first note was made payable, as would have been done in any other case, the parties adopt the loose commercial phrase applicable to

a note running in the bank, and evidently allude to the calls for partial, and for final payment, to be made on the part of the bank. There is no doubt that this construction of the instrument is according to its true meaning; and the mortgage continued a subsisting and valid security so long as the debt created in *September*, 1802, was kept alive in the bank, either in whole or in part, by these customary renewals. The mortgage, with its accompanying bond, fairly disclosed the nature of this continuing security, and no imposition was, or could have been, practised upon any subsequent purchaser or mortgagee, who would be at the pains to examine into the state of the debt disclosed by the bond and mortgage. The mortgage itself disclosed the nature of the debt secured by the bond, when it stated that the bond was taken as a *collateral security.*

Such a security for such a debt might subsist indefinitely; but what concern has the purchaser, or subsequent incumbrancer, with the nature of the security, provided there be no false lights held out, and he be, by the registry, timely and duly informed of the character of the lien?

The only objection of any force to the validity of the mortgage, as a security for these renewed notes, is, that the notes were occasionally *increased*, which might seem to be so far the creation of a new debt. But I apprehend such an occasional increase of the debt, on the periodical renewal, *provided the debt was kept within its original limits*, did not change the character of the debt, or affect the security. It is not so understood in the commercial world, and was not so intended by the parties to the mortgage; and an increase of the sum, on a renewal, was no more than a return of some of the calls made on the former renewals. The identity of the debt remained, so as to preserve the relation between that and the pledge. It would be dangerous and unjust, as between the parties, not to allow the whole note so renewed, to come under the protection of the mortgage. There was nothing here like the *novation* of the civil law.

There was no new debt created, differing in quality or character, or relation or security. It was according to mercantile and bank usage, (in reference to which the bond and mortgage were given,) a renewal or continuation of the same debt, under the same circumstances, and subject only to those fluctuations in amount, which are customary in such bank operations.

4. But if any part of the debt secured by the mortgage, be still due to *Lansing*, it is then contended, that the plaintiffs are entitled to redeem, and that there ought to be a reference, to ascertain the rateable proportions of such debt to be paid by the plaintiffs *B.* and *M.*, and the defendant *A.*, who may be bound to contribute, according to their respective interests in the mortgaged premises.

The plaintiffs, who are owners of the equity of redemption, are, no doubt, entitled to redeem, but they are not entitled to any delay. A motion to enlarge time for payment upon a bill to redeem, is new, and such a motion was refused by Lord *Eldon*, in *Novosielski* v. *Wakefield*, (17 *Ves.* 417.) where he observed, that in a bill to redeem, the plaintiff professes that his money is ready. He comes into Court, saying, " here is the money : give me my estate." If, then, the bill in the present case be viewed as a bill to redeem, the plaintiffs must redeem forthwith. I do not perceive that they are entitled to have the right of the defendant *L.* to proceed upon his pledge *suspended*, until this question of contribution can be settled between the two plaintiffs *B.* and *M.*, and the defendant *A.* It is a question with which he has no concern. It is strictly *res inter alios.* There might be much time consumed, before the ratio and amount of contribution could be settled. It is suggested by the counsel for the defendants, that the defendant *A.* is dead, and the suit, in that case, would have to be revived against his representatives, before the contribution could be ascertained. His proportion of the contribution would, at any rate, be small, for it appears by one of his answers, that he gave

On a bill to redeem, further time of payment is not given.

Nor will the proceedings of the mortgagee, under a power of sale in the mortgage, be suspended or delayed, until the plaintiffs, who are owners of the equity of redemption in different proportions, have settled the rateable proportion which each is to contribute towards the redemption.

only 100 dollars for his interest in the mortgaged premises; and it was only for part of an unexpired term, which is to expire in 1820, or a year hence, and it is averred to be worth no more than the annual rent of 37 dollars, which is charged thereon.

As between the two plaintiffs, *B.* and *A.*, who are not litigants before me, or against each other, it might be difficult to enforce the rate of contribution when ascertained. I am not aware that I could make any decree directly against either of them, in favour of the other, on that point, as the pleadings now stand before me.

There is no case that will warrant such an absolute delay of the rights of the mortgagee, under his mortgage, as is now sought, in order to have this question of contribution previously settled, in which he has no interest. In *Gill* v. *Lyon,* (1 *Johns. Ch. Rep.* 447.) to which I have been referred by the plaintiff's counsel, there was no delay of the mortgagee. He was merely ordered to sell one part of the mortgaged premises first, and if not sufficient, then to sell the residue, after thirty days notice to the purchasers of such residue, to redeem. So, in *Stevens* v. *Cooper,* (1 *Johns. Ch. Rep.* 425.) a mortgagee who had released part of the mortgaged premises, and deprived the owners of the remaining part, of their recourse to the owners of the other part, for contribution, was confined, but not delayed in his remedy, to the rateable proportion of the debt chargeable upon the remaining part. I do not find a case, or a principle in the books, to justify a stay of a mortgagee's remedy, until those who are entitled to redeem have settled among themselves, or by the aid of this Court, their just proportions of the debt. But the plaintiffs may still be entitled to retain the suit, and go on against the defendant *Adams,* or his representatives, to compel a contribution from him, to them, of his proportion (however small) of the mortgage debt. It may be so small, indeed, as not, in any event, to carry costs, or be worth pursuing; but still I am

content, that the suit continue for that purpose, as against *Adams.*

I shall, therefore, decree : (1.) A perpetual injunction in favour of the plaintiffs, *B.* and *W.*, against any execution or other proceeding, on the judgment confessed by *Bates* to *Lansing,* and docketed on the 3d of *April,* 1806, and that entry of satisfaction of record of that judgment, be made by the defendant *Lansing.*

(2.) That unless the plaintiffs *B.* and *M.*, or one of them, bring into Court and deposit with the register, for the use of the defendant *L.*, within thirty days, the sum of 720 dollars, together with lawful interest thereon, from the 8th day of *October*, 1811, unto the day of bringing in the same, the injunction heretofore issued, in respect to any proceeding under the bond and mortgage in the pleadings mentioned, be thereafter dissolved, so far as to allow the defendant *L.* to demand and collect under it, or by virtue of it, the sum of 720 dollars, with interest from the 8th day of *October*, 1811, until the money shall be paid, and the costs and charges of all necessary proceedings thereon.

(3.) That the bill, as to the defendant *B.*, be dismissed, and that unless the plaintiffs *B.* and *M.* shall, within thirty days, elect to proceed against the defendant *A.*, to enforce his proportion (if any) of contribution to the said debt and interest, so declared due to the defendant *L.*, and give notice of such election to the solicitor for the defendant *Adams,* that then the bill, as to him, shall stand dismissed.

(4.) The question of costs has become somewhat complicated, owing to the distinct claims put forward by the plaintiffs, and the various and unequal merits of the several pretensions.

The plaintiff *W.* is entitled to his costs, as against the defendant *L.*

The plaintiff *B.* and the defendant *L.* are not entitled to costs against each other. The defendant *L.* set up a judgment which was satisfied, and claimed more under the

mortgage than was due.   He, therefore, has no right to any
costs, though he succeeds in establishing a mortgage debt.
The plaintiff *B.* is not entitled to costs against the defend-
ant *L.*; for though he has successfully overthrown the un-
just pretentions of the defendant *L.*, under his judgment,
he has failed in his charge that the mortgage was satisfied
and kept on foot by fraud, a charge which he persevered
in making, even down to the hearing of the cause.

The plaintiff *M.* has also failed in his claim, which was,
to defeat the mortgage absolutely, as being satisfied, and as
being fraudulently set up, but he has so far succeeded as to
reduce the mortgage to one half, and less of. the amount
claimed under it, and, perhaps,'neither he nor the defendant
*L.*, ought to have costs, as against each other.   The case is
the same as between the plaintiff *B.* and the defendant *L.*,
and the same conclusion ought to follow.

As the defendant *B.*, the original mortgagor, had no inte-
rest remaining in the mortgaged premises, but it had all
been sold on execution, and purchased in by the plaintiffs *B.*
and *M.*, and the defendant *A.*, he had no interest in the con-
troversy, and was not a necessary party.   And if he had
conducted himself properly, he would have been entitled to
his costs of the suit.   But he united in his answer with
*Lansing*, in setting up the subsisting validity of the judg-
ment, and of the entire mortgage debt.   The answer in this
respect was not true, and the defendant *B.*, in a further an-
swer, admitted that the judgment debt had been paid.   I think
he may be considered as having forfeited his title to costs;
but, certainly, the plaintiffs cannot claim costs against him,
when they show, by their bill, that he had parted with all
his interest, and against him no decree could be prayed.

Lastly; If the plaintiffs should not elect to proceed by
contribution, and the bill as to the defendant *A.*, should be
dismissed, it must be dismissed with costs.

Decree accordingly.

1819.

BRINCKER-
HOFF
v.
LANSING.