318] *CHARLES C. PAINE *v.* JACOB FRENCH AND JOHN FORD.

> Assignment of debt secured by mortgage, and delivery of mortgage deed, good transfer of the mortgage.
>
> Before the act of 1818, seal of justice was not required to an acknowledgment of deed, except in a case of *feme covert.*
>
> Holder of a recorded mortgage does not act fraudulently, if he prepare, as counsel, a subsequent mortgage and remain silent as to his own.
>
> Allegations and proofs must correspond.

THIS was a suit in chancery, to subject to sale certain mortgaged premises, and was reserved from the county of Geauga. The bill was filed by Charles C. Paine, as administrator, with the will annexed, of Samuel W. Phelps, and set forth that on June 8, 1813, the defendant French, who then owned the premises in controversy, mortgaged the same to one Daniel S. Coit, to secure the payment of five hundred dollars, which mortgage was duly recorded, and afterward, on May 18, 1819, was duly assigned by Coit to the defendant Ford. This assignment was also duly recorded. On September 27, 1814, French mortgaged the same lands to one Gaius Pease, to secure the payment of a note of the same date, for the sum of nine hundred and ninety-seven dollars and twenty-nine cents, payable in one year. This mortgage was recorded September 29, 1814; but there was *no seal* attached to the certificate of acknowledgment by the justice of the peace. On November 11, 1814, Pease assigned his mortgage to Phelps, of which assignment French had notice, and on January 20, 1816, paid Phelps upon the mortgage four hundred and fifty dollars. On November 16, 1818, French conveyed the lands in controversy, with general warranty, to Ford; the deed was recorded on December 18, 1818, and was absolute in its terms, but intended merely as security for advances made by Ford. On March 19, 1827, French gave Ford a quitclaim deed for the same premises, under which Ford took possession, French having always occupied previous to that time. Phelps died on July 1, 1826. The complainant prayed that the mortgaged premises might be sold, subject to Coit's mortgage, and the proceeds applied to the payment of the mortgage assigned by Pease to Phelps.

The defendant, Ford, answered, and denied all knowledge of the

Paine *v.* French and Ford.

note and supposed mortgage given by French to Pease, but admitted that after the deed to himself, of November 16, 1818, he had heard of said supposed mortgage, but insisted *that it could [**319** not operate as notice, in consequence of the want of a seal to the acknowledgment. He also denied all notice of the supposed mortgage at the time he took the assignment of Coit's mortgage. He further alleged, that on November 16, 1818, he purchased the premises of French for the sum of four thousand five hundred dollars, and was at that time entirely ignorant of any mortgage on the same, except Coit's mortgage; that Phelps had full knowledge of this purchase, and the payment of the consideration money; that this defendant and French applied to Phelps to draw the deed, who did so; and was not only silent as to any claim he might have on the land, but told defendant that there was no mortgage or other lien on the same, except Coit's mortgage. This defendant neither admitted nor denied that the deed of November 16, 1818, was intended to secure advances made by him to French.

The defendant, French, admitted all the material allegations in the bill, and stated further, that at or just before the time of the execution of the deed of November 16, 1818, he gave Ford notice of the mortgage to Pease, and also stated that the deed was intended only as security for advances, and that Ford gave him an instrument of writing to that effect.

It appeared from the exhibits and testimony, that the note given by French to Pease for nine hundred and ninety-seven dollars and twenty-nine cents, was assigned by Pease to Phelps, by an indorsement on the back of the note; but there was no actual assignment of the mortgage, which was given to secure the note. It was admitted that the deed of November 16, 1818, was drawn by Phelps, and in his own handwriting. It was also in proof, that some time in the spring, or in the month of June, 1826, Phelps told the witness that he had advised Ford to give French further time to pay his debt, and assigned as a reason that Ford had a clear title to the farm, or that there was no claim on the land except Ford's; and that there was an agreement between French and Ford, giving further time to pay, which was written by Phelps, but was afterward canceled.

*PHELPS, for the complainant.                    [**320**

WEBB, for defendants.

---

---

By the COURT:

1. It seems to be settled law, that an assignment of a note in writing, and delivery of the mortgaged deed, transfers all the rights secured by the mortgage. 1 Johns. 580; 3 Johns. Cas. 322; 2 Sw. Dig. 110; 4 Johns. 41; 1 Gallison, 155; 1 Ohio, 320.

2. Is the mortgage to Pease defective, for want of a seal to the acknowledgment of the justice of the peace? No seal, or other ceremony, in the acknowledgment of deeds, executed by a man, or by an *unmarried woman*, was required by any law of this state, until the statute of 1819. Vol. xvi. 192. The law adopted from Pennsylvania, in 1795, required that all deeds executed by *husband and wife* should be acknowledged in a certain manner, and such acknowledgment should be certified, upon the deed, under the hand and seal of the judge, or justice of the peace.

This distinction between deeds executed by husband and wife, and other deeds, was maintained in the statutes of 1802 and 1805, and it was not till 1818 that the distinction was annulled, and a seal required to the acknowledgment of all deeds.

The seal, and other ceremonies, in the acknowledgment of deeds by husband and wife, were doubtless intended to protect the rights of married women; and were originally introduced into our law to supply the place of the common law formalities, in the conveyance of real estate by *femes covert*.

The mortgage in question having been executed in 1814, by French alone, no seal was required to the acknowledgment; it was, therefore, well recorded, and conveyed notice to Ford.

3. The mortgage having been duly recorded, Ford's subsequent purchase was necessarily subject to the rights of the mortgagee, or his assignee, unless there was such a fraudulent suppression of 321] the truth, or suggestion of falsehood, by *Phelps, as to authorize a court of equity to postpone or annul his mortgage. If, at the time of Ford's advancement or purchase, Phelps denied, or stood by, and when questioned, concealed his own title, he practiced a fraud, and has no right against Ford. 4 Johns. Ch. 65.

Ford, in his answer, alleges that Phelps drew up the deed, and was not only silent as to his own claim, but asserted that there was no mortgage or other lien on the land, except Coit's mortgage. This allegation is not responsive to any charge contained in the bill, but is new and distinct matter, set up in the answer, to avoid a pre-existing right in Phelps, and must therefore be proved. 2

Paine *v.* French and Ford.

Johns. Ch. 62; 2 Vesey, 587; 1 Johns. 580. It is agreed between the parties, that Phelps drew up the deed from French to Ford; but this circumstance neither proves nor disproves the charge of fraud. It is not sufficient to postpone a prior mortgage, that the mortgagee assisted in the execution of a second mortgage; but it must appear affirmatively, that the first mortgagee denied or fraudulently concealed his title. The mortgage of Phelps being duly recorded, was notice to all the world, and the fact that he acted as a scrivener in drafting a subsequent mortgage, can not, *per se,* operate as a forfeiture of his rights. There is no evidence that Phelps, at the time, either concealed his title or denied its existence.

The only testimony in the cause is the deposition of the younger Ford, and that refers exclusively to a transaction in 1826, a few days before the death of Phelps, and nearly eight years after Ford's purchase or advancement. This testimony, taken in its strongest sense, amounts to no more than an admission by Phelps that the mortgage money had been paid. But Ford, by his pleadings, does not rest his rights upon this ground. He does not pretend, in his answer, that the mortgage was paid in 1826, or at any other time, but insists that Phelps shall be postponed, by reason of the alleged fraud practiced in 1818. His proof does not correspond with, or support his allegations. A defendant can not set up one defense in his answer, and upon the final hearing rely upon another. His allegations and his proofs must correspond.

Decree for complainant.

*Judge BRUSH dissented: [322

The testator in his lifetime, to wit: November 11, 1814, obtained from Gaius Pease, the assignment to him of a note of hand for nine hundred and ninety-seven dollars and twenty-nine cents, payable one year from date, and dated September 27, 1814, made by defendant, Jacob French, to said Pease. January 20, 1816, said French paid testator four hundred and fifty dollars; the receipt of which was indorsed on the note, as a credit or receipt of so much that day on the note. To secure the payment of that note, defendant French had given to said Pease a mortgage on three hundred and two acres of land, lying in Geauga county, bearing date, and no doubt executed and delivered on the same day of the note, September 27, 1814. It is said in the bill, and admitted in French's answer, that this mortgage was assigned and transferred by Pease to the testator,

by the assignment of said note. There is nothing in the note, or assignment thereon, which refers to the mortgage in any way; nor is there any assignment or transfer in writing, of said mortgage, by Pease to testator. French, before the execution and delivery of the above mortgage by him to said Pease, had given a mortgage for the same land to Daniel L. Coit, bearing date June 8, 1813, to secure the payment of five hundred and six dollars. This last mortgage was sold and transferred, by assignment in writing, May, 1819, by Coit's agent, Perkins, to defendant Ford. Before that time, to wit: November 16, 1818, defendant French sold and conveyed to Ford the same land, for the consideration of four thousand five hundred dollars. This deed was written for the parties by the testator, Phelps; that is, a printed blank deed was filled up by him, at the request of the parties thereto, said French and his wife, of the first part, and defendant Ford, of the second part.

The bill states, and the defendant, French, admits, that he gave to Ford a quitclaim deed for the same land, March, 1827. Defendant, Ford, says nothing about this quitclaim deed, in his answer, probably because he considered it unimportant in the controversy, as it undoubtedly is.

**323]** *Phelps, the testator, died in 1826. His administrator, with the will annexed to his administration, now brings this bill setting forth the above conveyances and incumbrances upon said farm and tract of land, and insists on the right of his testator and his right, as personal representative, to have the premises sold to pay him as such administrator the balance due on said note, after satisfying the prior incumbrance, created by the mortgage to Coit, now belonging to defendant Ford; and that after deducting the said sum of four hundred and fifty dollars, paid and indorsed on the said note, the balance thereof is due.

The above deeds were all duly recorded in Geauga county, and each of them is still entitled to preference, according to its date, unless the defendant, Ford, has alleged in his answer, and proved sufficient to postpone and bar the mesne incumbrance to Pease, of 1814, which intervenes between the Coit mortgage of 1813 and Ford's deed of 1818; and the plaintiff will be entitled to the relief he seeks if he has sufficiently shown his right to the mortgage from the defendant, French, to Pease, and has the proper parties before the court to enable them to decree.

Ford's answer denies explicitly more than once all knowledge

(that is, all actual knowledge) of the existence of the mortgage and note from French to Pease at the time he received the deed from French to him, and paid for the land the consideration therein expressed. He states, in his answer, that testator Phelps had full knowledge of the purchase by him from French and the consideration; and that he, Phelps, was applied to by both to draw the deed, and did draw it; that it is in his handwriting, and that he, Phelps, then told him, Ford, that there was not any mortgage, claim, or lien on the land except his, Ford's, and charges the fraud of concealing the mortgage to Pease, etc.

Plaintiff's counsel admit, in writing, that the deed from French to Ford, dated November 16, 1818, is in the handwriting of Phelps, except the printed part, the signatures of the grantors, and witnesses. The deposition of Seabury Ford, defendant's son, proves the confession of Phelps, made in 1826, that he "had advised defendant, Ford, to give time of payment to French for his debt, assigning as a reason *that he, Ford, had a clear title [**324** to the farm, or that there was no claim on the land except his, or similar words conveying the same idea; and it being so clear was a sufficient security for the debt." In answer to a question by counsel, "If Phelps told the time he had this conversation, and gave this advice," witness answers: "I do not recollect that he did, but I suppose that it was a few months before, as an agreement was made between said French and Ford, giving further time to pay; and said agreement was written by Samuel W. Phelps, but was afterward taken up and canceled."

The bill states that Phelps died July 1, 1826. Defendant Ford could not, therefore, by interrogations in his answer, call for any confession of the matters stated by him. There is not, and consequently could not be, any denial of those allegations. Yet the plaintiff must prove them, but is not bound to the extraordinary proof of two witnesses, as in case of a denial by a party under oath, or of one witness with circumstances corroborating his testimony.

The ground of defense, upon the merits in this case, is that if Phelps was the real owner of the mortgage from French to Pease, he fraudulently concealed from defendant Ford the knowledge of the fact, or that any such claim rested upon the estate in controversy at the time when it was important for him, Ford, to know it, and when he, Phelps, was bound in conscience to disclose.

I know of no legal reason why I may discredit the witness, Seabury Ford, although he is the son of defendant, for whom he testifies. There is no denial of the matters he has related, or evidence against his character. His evidence harmonizes, in every respect, with the uniform conduct of the testator, sustaining the honesty and fairness of that conduct, which, otherwise, it would be impossible to reconcile with integrity and honor.

Are we not bound to believe that a witness, uncontradicted, tells the truth when he proves the adversary party honest, rather than presume the contrary without any proof? There is no evidence that Phelps ever claimed the mortgage of Pease as a security for the note assigned to him ; he might, therefore, well say there was no other lien upon the land but Ford's, and persuade Ford to give 325]   time of payment, *and write for the parties an instrument stipulating such extended credit, which, in this instance, had the effect in law to convert the absolute deed into a mortgage. The witness was not informed by Phelps, when he gave the advice, to give time of payment. What, then, is our duty but to infer that the time was when the act done would have the effect intended, and which the witness says it had ? The object and purpose of the statement of Phelps, and his advice to Ford, was to procure time of payment for French. The motive of Phelps may be altogether immaterial, but it is difficult to imagine any other than a favor to French, or to advance his own interest, or both. The latter might be effectually accomplished by the delay, which might enable French, in the meantime, to raise the money to pay off Phelps' debt, if he owed him any at that time on that note, or on any other account. Whatever the motive or object, the effect of those statements and advice was to change the nature of the title which Ford had to the land, from an absolute to a conditional fee, extending the equity of redemption to French a considerable length of time, and thereby enlarging his rights. This, in law, happen when it would, is sufficient to postpone and bar the lien of him who procures this to be done by denying his own title, if he has any at the time, and persuading thereby his adversary to change his. And more so, if this was done (and I feel warranted, from the evidence and all the circumstances of the case, to find it was) at the time when the absolute deed was made. It seems to me there is better reason to believe it was done at that time than any other. That it was *done* there is no reason to doubt, unless

there be good reason to discredit the witness. As I understand the case, the actions of the parties, and the circumstances of the entire transaction, corroborate the witness in every particular, so far as he undertakes to speak with any certainty. The testator acquired his right to that lien, if at all, when the note was assigned to him, and by that act—that was 1814. A payment was made to him in 1816 of four hundred and fifty dollars. Is it not remarkable he did not assert his right to this security and coerce payment of this debt during his life, if he had the right, and the debt subsisted from 1814 or 1816 until 1826? In the meantime deny his own right and assure his *neighbor *his* was perfect! I can not [326 overcome the reluctance I feel to set it up at this late day.

A sleeping mortgage, denied during all the life of the testator, to be set up after his death by his personal representative, and that with such a doubtful title to it, as here is manifested. It may sleep on for me. I can not lend my aid to give it force to take from that neighbor his estate, clear of every other embarrassment, and clear of this, if any faith may be given to the assurances of this testator, in his life and in his actions, neither of which in this respect did he ever contradict. It is due to his memory to believe, as he declared, that no such claim existed on the land. I should also be prepared to say, that as he acted as the agent of French and Ford, in preparing the deed from French and wife to Ford, being the scrivener, it would be fraudulent in him, if alive, to set up any claim to an incumbrance which he then held on the land, and forbore to disclose to Ford, who was giving a full consideration for it. Within the meaning of Chancellor Kent, in Brinkerhoff and others *v.* Lansing, 4 Johns. Ch. 70–72, I consider this employment of the testator to prepare for the parties the conveyances as equivalent to " *asking information,*" and his " *silence deceptive,*" if indeed he could claim any title vested in himself, at that time, of the same land thus about to be exchanged by French for so great a price.

For him to insist on his title, under such circumstances, if not technically " *active fraud,*" within the chancellor's meaning, it seems to me he would say it was most wickedly *inactive deception,* and treacherous; against good faith, and pernicious in its consequences. In its features and circumstances there is really no analogy between that case and the present. It introduced the subject of this fraud ( by concealment of title when others were dealing).

---

---

but made no case for relief. And the chancellor, in discoursing upon it, ran it down so eloquently that there would be room to question the precision or accuracy of his language as to this *active fraud,* there considered necessary in all cases, if it could be made applicable to this case and its circumstances. On the whole, it is my opinion, that the bill ought to be dismissed; and, at any rate, 327] that no decree can be made for plaintiff *until Gaius Pease be made a party. Mallow *v.* Hinde, 12 Wheat. 193, 196; 9 Cranch, 25; 1 Peters, 243.