## Case No. 6,908.

### HUNTER v. MARLBORO'.

[2 Woodb. & M. 168.][1]

Circuit Court, D. Massachusetts. Sept., 1846.

TRUSTS — FRAUD UPON CREDITORS — RESULTING TRUST—EVIDENCE—POSSESSION — SPECIFIC PERFORMANCE — LENGTH OF TIME — STATUTE OF FRAUDS—WITNESSES—INHABITANTS OF TOWNS— RE-HEARING—COSTS.

1. Where A. while in prison conveyed to B. his farm worth near $2000, for the consideration of $250, and took the poor debtor's oath, and continued in possession of the farm for many years, till his death, it is primâ facie evidence of a trust between A. and B.

[Cited in Tufts v. Tufts, Case No. 14,233.]

2. But being a trust to defraud creditors, a court of equity will not lend its aid to enforce such a trust.

[Cited in Tufts v. Tufts, Case No. 14,233.]

3. If B., after some years, execute the trust by receiving payment of what he advanced, and conveying the farm to C., at A.'s request and for A.'s benefit, to borrow more money, it is questionable whether the original fraud can be objected to the enforcement of this new trust in C.

4. But if C. gave back to B. a defeasance, rendering the conveyance to C. a mortgage, and C. assigns his interests to D., it must be proved distinctly that C. and D. recognised the estate to be held in trust by them for A., and in such manner as to take it out of the statute of frauds, or it could not be enforced as between them and A.

[Cited in Jewett v. Cunard, Case No. 7,310; Tufts v. Tufts, Id. 14,233.]

5. Long possession by A., receiving interest from him, the sum paid by them being much below the value of the farm, and any writing, such as a receipt or bond recognising A.'s rights as a mortgagor, are competent evidence to show this trust.

6. Where the town purchased the farm with such a trust existing, if all the written evidences of it were given up by A. to be cancelled, and he made a new agreement with the town to provide him other buildings, and let him have a portion of the farm, the former trust is extinguished. And if the town fail to fulfil all the new agreement, the former trust does not remain, but the remedy of A. is at law for damages, or in chancery for a specific performance of such part of the new agreement as remains unfulfilled.

7. It is competent evidence of the new agreement and its contents, to show what the parties said and did on the subject near the time when the statements were made to agents of the other side and not denied; and when the acts are natural and consistent with the idea of such a new agreement.

8. So are such acts evidence of its performance, in part or in full, as the case may be; and if showing only the former, it takes the agreement out of the operation of the statute of frauds, in a court of equity; and the residue of it will be enforced by decreeing a specific performance, if no other obstacle intervenes.

[Cited in Sumner v. Marcy, Case No. 13,609.]

[Cited in Massing v. Ames, 38 Wis. 287.]

9. Length of time constitutes no objection to a specific performance, if not pleaded in the answer, and the condition of the parties and property remains substantially the same in this respect, and the party in default has conducted during the time as if the other party was entitled to have this further performance. Such a conveyance might also be ordered on an injunction to quiet so long a possession, as in a bill of peace.

10. Length of time, pleaded against the enforcement of a trust in real estate, would avail if the trustee has been openly, publicly, and constantly in possession, and denying the trust during twenty years.

11. What evidence takes an agreement as to lands out of the statute of frauds, and what shows a resulting trust, considered.

12. Inhabitants of towns in this state are competent witnesses in actions where the towns are parties; and their confessions when made as individuals, and not in the capacity of agents or officers of the town, are not competent evidence to bind the town.

13. An application for a re-hearing must usually state some reason, which would constitute a good ground for a new trial at common law.

[Cited in Bentley v. Phelps, Case No. 1,332.]

14. If testimony was offered and fully considered as to the value of a farm, but applied in argument to one point, and the court applied it to another, a re-hearing is not proper to argue and consider again the evidence as to the true value.

15. Nor will it be allowed to re-argue the testimony as to the acceptance of a tenement in fulfilment of a contract, when that point was before noticed and discussed, though not as a principal one in the case.

16. Costs in equity go primâ facie to the prevailing party, and it is desirable to depart as little as possible from the rules at law on this subject.

[Cited in Hovey v. Stevens, Case No. 6,746.]

17. They will be departed from, however, in strong cases; where costs are not equitable, the

---

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

party not prevailing on the merits, or on an important point, or on what was known, or ought to have been known, to the opposite party.

[Cited in Hovey v. Stevens, Case No. 6.746.]

This was a bill in chancery, filed May 22, 1842. It averred, that David Hunter, whose heirs the complainant [William Hunter] represented, was on the 30th of October, 1801, seized of a farm in the town of Marlboro', containing about two hundred and sixty acres. That this farm, by various conveyances afterwards, which were detailed, had on the face of them passed to that town in fee, by a deed, dated the 4th of May, 1821, and that said David still remained in the actual possession of the farm during all that period, claiming an interest therein as mortgagor and cestui que trust. Several facts are set out in the bill in detail, to show his interest. The bill then alleged, that it was agreed between said David and the town, in May or June, 1821, that the latter should provide a suitable house and barn on the farm for him, and have set off enough of it for a pauper establishment for the town, not exceeding what the town had paid, in order to obtain their title, and should release the residue to him, and he release their portion to them; and that he, thereupon, allowed the town to take possession of the farm till the business was completed, but under the paramount claim of said David, who remained in his former house till about the 25th of May, 1822. That then, by false promises, he was induced to remove to another house, near said farm, and occupy about nineteen acres of land of little value, which the town had set off to him without his consent, while the whole of the farm was then worth $7000. That the money paid for it by the town did not exceed $1100; that the town has since continued in the occupancy of the residue of the farm, not so set off, taking large profits therefrom, though without the consent of David or his heirs; and that he occupied the part so set off till his death, on the 23d of March, 1824, and his heirs since, without any payment of rent, or deed therefor from the town, and with a continued claim to the title of the whole farm till the town should fulfil their agreement aforesaid, and with several acts of ownership accompanying this, as to the whole done from time to time by said David and his heirs. Next it was averred, that in the year 1832 or 1833, the town proposed to purchase of the heirs of David, their title to the farm, and offered to pay them therefor $1000, and release all interest in the nineteen acres set off to their father; but that this was declined by them. The bill also states, that said David was a man of feeble mind, not well acquainted with business, and easily misled. Several other allegations, introduced into the bill, will be adverted to in the opinion of the court, so far as they may be found material. The complainant having obtained a conveyance from all the other heirs of David, he being one of his sons, is stated to have made a demand upon the town to fulfil the trust existing in favor of his father and heirs, and to account to him for the rents and profits, and receive any balance due, which he has ever been ready to pay; but that the town, under many pretences assigned, refuse to do the same. The complainant, therefore, prays, that the town be made to render an account of their receipts and expenditures concerning the farm, and if a balance be due to the heirs, be ordered to pay it over, and if a balance be due to the town, that on the payment of it by the heirs, the town be directed to convey to the complainant all the farm, free from all incumbrances, and for such other relief as the nature and circumstances of the case may require.

The answer admitted the seisin of David Hunter in 1801, but averred, that his title was derived by deeds from Edward Hunter, his father, the validity of which was then disputed, and reduced the value of said farm in the market in 1821, and has since led to a very expensive suit therefor against the town. The answer then proceeded to admit the various conveyances set out in the bill from 1801 to 1821 inclusive, but denied most of the statements made of any trust in them by mortgage or otherwise in behalf of said David. The answer alleges, in the next place, the execution of releases by David of his interest in said farm, and by his wife of any claim on her part, and sundry other conveyances by him not specified in the bill, with copies of the papers in suits against Joab Stow, one of the grantees of said David, attaching his interest therein after a mortgage thereof, and selling the same on execution to one Stevens, who, in 1821, conveyed his title to the town. Several other matters as to the title and trust, set up in opposition to what appears on the face of the conveyances, are denied and some admitted, which will be referred to in the opinion of the court when found important, and the statute of frauds is pleaded against any trust set up by parol evidence. The answer in relation to any agreement made with David Hunter in 1821, as to allowing him to occupy a part of the house till April, 1822, or till they provided him with another house and barn, admits they made one to that effect, after their purchase of the farm from other persons was completed, but not till then. Nor did they at any time, as they allege, agree to convey to him or his heirs any portion of the farm; and that all arrangements or contracts, verbal or otherwise, between David and their grantors, were surrendered and cancelled soon after their purchase, and peaceable possession of the farm was delivered to the town. They further deny any agreement at the time of the purchase,

or afterwards, to convey to said David a house and barn, and piece of the farm to cultivate; but admit, that, as a gratuity, they subsequently promised to let him occupy such a house and barn and piece of land, separate from the paupers, or the rest of the farm, and fulfilled their promise; and that he settled all demands with them, and about the 10th of May, 1822, peaceably and voluntarily removed to the house aforesaid, and gave up full and exclusive possession of the rest of the farm to the town. They next aver, that the town has since had the exclusive possession and control of the farm, and that David or his heirs have not exercised any acts of occupation except as trespassers; and that for these they have, when known, been prosecuted. They deny, also, any weakness of mind or other incapacity in said David, and any acts of fraud in relation to him, or the purchase of the farm, or any offer in 1832 or 1833 to pay the heirs any thing to release their title thereto, and assert that they now hold and have ever held it free from any trust, equity, or condition whatever, and are not liable to render any account for the income therefrom to the complainant. There were some amendments made to the bill before the case was printed, and a new answer filed thereto, which related chiefly to details as to the conveyances of this farm between 1800 and 1822, and the nature of said David's occupation thereof in 1821, which will be further explained hereafter by the court, so far as found necessary. Another amendment was moved, during the trial, to make a statement in the bill correspond with the records of the town, and various objections to the questions put to different witnesses were raised, and the competency of several objected to, all of which, when relating to matters important to the points decided by the court, will be noticed and disposed of in the course of its opinion. The dates and parties to these conveyances, offered in evidence, so far as material, were as follows, and also of some other papers.

Deeds.—David Hunter to Joab
  Stow ............... 8 July, 1802.
Joab Stow to Eleazer
  Bradshaw .......... 28 Aug. 1806.
Bond back to re-convey, on payment of
  $1066 .............  "  "
Abigail Hunter (wife of
  D. H.) to E. Bradshaw ..............  "  "
Mary Hunter (sister of
  D. H.) to El. B.....  "  "
Suit—{John and Phillip Coombs, executors of E. B. v. D. Hunter, to foreclose B.'s mortgage ........} 2 Nov. 1813.
Deed.—J. & P. Coombs to A. & J. Goodale, and W.
  Draper ............. 1 Jan. 1814.
Receipt.—W. Draper to D. Hunter, of interest on
  bond ............. 7 Oct. 1815.

Deed.—J. & A. Goodale and Wm. Draper to town
  of Marlboro' ........ 4 May, 1821.
D. Stevens to town of
  Marlboro' .......... 12 May, 1821.
D. & E. and J. & E. A. Hunter, to Wm. Hunter, of their interest
  as heirs ........... 9 May, 1842.

There was also much evidence in the case concerning the value of the farm in 1821, as well as at this time, and in respect to payments of interest or rent by Hunter between 1806 and 1821, and as to claims set up by him and his heirs to some interest in the whole farm, and contradictory testimony concerning his willingness to remove in the spring of 1822, and uniting in the set-off of the land at that time, and on various other matters, such as the imbecility of his mind, the votes of the town, and the conduct of its agents or committees, and the characters of Joab Stow and D. Stevens, which need not be detailed here, but are adverted to when necessary in the opinion. The hearing of this case commenced in June, 1846, and was finished at the adjourned term in September, 1846.

G. Parker and Bridge, for complainant.
E. R. Hoar and E. Mellen, for respondents.

WOODBURY, Circuit Justice. This is a case of no little intricacy and doubt. The events in dispute occurred long since, some of them near half a century, and most of them over a quarter, and they are naturally obscured by time and death and forgetfulness. They are rendered still more doubtful, by an attempt in most instances of controverted facts to prove what is relied on, by oral testimony rather than by writings or records: and several of the legal questions raised have been rendered the more difficult by founding them on supposed oral agreements between parties, often secret and loose and at variance with the written conveyances. They are thus attempted to be maintained in equity through resulting trusts, or part performances, or some detached recognitions of them in subsequent writings. But I am obliged to take the case as it is presented; and after being elaborately argued on both sides, and considered by the court with care, I shall render that judgment on it which the facts, so far as they can be unravelled, and the law and the equity of the case seem to demand. The conclusions at which I have arrived are such as to render unnecessary any decisive opinion on several of the questions discussed, and many of the objections taken to the testimony. As to others, preliminary to the merits, such as the motion to amend the bill, so as to conform to the record of the town, which was not before the respondents when they answered, it is granted in order not to leave them in a false position. I do this, on that account, though the matter of the

amendment will be of no importance in the view taken by the court, and if it was, the influence of what was stated at first, and has been thus corrected, would have to be weighed as it deserved under all the circumstances.

Another of these preliminary questions is the competency of the inhabitants of the town as witnesses, and the competency of their admissions or statements pertaining to this subject. I consider it to be well settled in New England, ever since it has been divided into townships, endowed with certain specified powers as public political corporations, and holding little property except for public purposes, and the inhabitants of them liable to taxes only for public objects, and the property held by each, being private and independent, rather than in common with the rest, that those inhabitants are competent witnesses in actions where the town is a party. 1 N. H. 273; 5 Conn. 416; 12 Johns. 285; and other cases cited in a note, 1 Greenl. Ev. 208.

Their interest is of so public a character, rather than private, so small in any event in a pecuniary view, and the necessity of the case such to prove transactions occurring in a town by the inhabitants, or not all (23 Pick. 13), that their competency has been very uniformly admitted, leaving their credibility to be weighed under all the circumstances by the jury. Any principle, which would exclude the inhabitants of such public corporations of a political character from being witnesses, would exclude the inhabitants of a county where that is interested, or even the inhabitants of the state in all public prosecutions in the name of the state; a ruling that would be suicidal to the judicial tribunals themselves, and leave them, as well as all individuals within the state, exposed to criminal outrage and destruction, without the means of legal proof for redress or punishment. Where these considerations have not led courts to admit such inhabitants as witnesses, as it seems to me they ought to, without a special statute authorizing it, or when doubts have required declaratory legislation, it has been at times had in favor of their admission, as in Vermont, Massachusetts, Delaware, New Jersey, and Louisiana, as well as now in England by 54 Geo. III. c. 170, and 3 & 4 Vict. c. 25. The difference between official members or officers of a corporation and private members, is as great as that between trustees and cestui que trusts. [Louisville, C. & C. R. Co. v. Letson] 2 How. [43 U. S.] 510, 511, arguendo; City of London v. Wood, 12 Mod. 669. So it is well settled, that citizens of a county or state may be judges in cases where the county and state are a party, whether they be civil or criminal suits. But if the judge is mayor of a city, and the suit is in the name of the mayor and commonalty, perhaps he cannot sit, without a license by statute, as it is trying what really, as well as nominally, is his own cause, as an officer. But if the suit was in the name of the city of London, or of its mayor and commonalty, and the judge was merely a citizen of London, he could sit. Id.

The next question connected with this, in the present cause, is, whether the confessions of such inhabitants are competent evidence to bind the town. This question does not depend on the decision of the former one, and allowing such confessions to bind, when the person making them is not a competent witness, and excluding them when he is, as argued at the bar. Because, unless a person is a party on the record, or an agent to the party, or is the party in interest conducting the suit, his admissions are, as a general rule, not competent in respect to it, whether he be admissible as a witness or not. Here the confessions of the inhabitants are not competent, because, as individuals, they are not parties, the suit being in the name of and for the public corporation (21 Me. 506); nor are the inhabitants the parties in interest as individuals, but are merely liable in a certain contingency to be affected by the result in their public relations and public liabilities. The defendant, as a corporation, may make admissions by its votes and records, which would be competent, and so by its duly authorized agents; but these would be admitted, because confessions of the corporation, either made in its corporate meetings by a vote, or made by its public representatives, selected and authorized by such a vote, and made in that capacity, and not in an individual capacity, as in that of a mere inhabitant of the town. 8 Pick. 127; 1 Metc. (Mass.) 479. Who ever heard that the confessions of a private citizen of the state should bind the state? or of a citizen of a county should bind a county? The English cases on this subject are cited as conflicting with these views. 1 Greenl. Ev. p. 208; 11 East, 586; 1 Maule & S. 636. But they may have been, in some instances, where the confessions of the inhabitants appeared to be of such as were acting in the capacity of agents for the town or parish. Or they may have been in other cases, where the town or parish did not sue as a corporation. But however they may have arisen, the confessions of inhabitants merely as such, are here not competent.

Passing next to the merits of this case, there are a few leading features in it, respecting the early conveyances from D. Hunter, about which little contradictory evidence exists, and which force the mind strongly to one conclusion. The first is, that he was seised of these premises, and in the actual occupation of them in 1801; that the farm was large, consisting of more than two hundred and fifty acres of land, with the usual buildings; that while in prison for a small debt of only $14 and costs, he conveyed the whole to one Joab Stow, for

the consideration of only $250 named in the deed, and without other proof of any debt or payment whatever between them; that he then swore out of jail, taking the poor debtor's oath, and immediately returned to his family, still residing on the farm; and that they continued, uninterruptedly, to occupy the same till the conveyances of it to the town of Marlboro', twenty years afterwards, in A. D. 1821. Without going into the disputed facts in that interval to sustain or rebut the idea of a secret trust in the conveyance to Stow in favor of Hunter, this length of possession by him after that conveyance would alone be strong evidence of its existence, if not sufficient proof to raise a presumption, in the absence of contradictory circumstances, that the secret trust extended to the whole title, and had been afterwards executed by some deed back from Stow to Hunter, and which had since been lost by time or accident. Such being the first general impression, made by that part of the case, the next inquiry is, how do other particular facts tend to strengthen or repel it?

The subsequent mortgage of this farm by Stow to Bradshaw, in August, 1806, to secure $1000, which is among the written evidence bearing on the question, is a fact which on its face tends to rebut the idea of a secret trust, as it would seem to be using the premises for his own benefit by Stow; and the attachment of his equity of redemption afterwards by Stow's creditors, and the sale of it to pay his debts, would tend to strengthen the same position, and to extinguish the trust to Hunter if it had ever existed. More especially would a court be obliged to regard it as extinguished, and not, at any future time, attempt to execute it, on that proof alone, since the trust in Stow, if existing, was a fraudulent one, in order to injure Hunter's creditors, and was in substantial opposition to Hunter's own oath as a poor debtor. See Flagg v. Mann [Case No. 4,847].

A party in a fraud, in fact, cannot come into court and ask the aid of equity or law to help him carry the fraud into effect, or a trust connected with it, which has not already been executed. It is not coming with clean hands, not doing equity before claiming it. It would be to assist a particeps criminis, and help one to do what was contra bonas mores, as well as malum prohibitum, and against public policy. Clapp v. Tirrell, 20 Pick. 247; Kerr v. Lord Dungannon, 1 Con. & L. 335; Munro v. Allaire, 2 Caines, Cas. 183; Saltmarsh v. Beene, 4 Port. (Ala.) 283; 3 Paige, 154; 2 A. K. Marsh. 57; 4 Bibb, 70; 5 Wend. 579; Tufts v. Tufts [Case No. 14,233], and cases there cited.

But the counsel for the complainant view this transaction in a different light. They contend, that the money obtained of Bradshaw was in truth for the benefit of Hunter, in pursuance of the original trust in Stow in Hunter's favor; that the bond of defeasance, given back by Bradshaw to Stow, was really for the benefit of Hunter; that Hunter then in fact settled all Stow's claims on the land; that Bradshaw leased the farm to Hunter rather than Stow for the interest instead of rent, for the same reason and in part execution of Stow's trust; that Hunter and not Stow actually had the money of Bradshaw, and was sued by the Coombses, executors of Bradshaw, as mortgagor, and to foreclose the mortgage, thus furnishing written evidence both of a trust existing and of its execution in part by Stow through Bradshaw; that Hunter procured the Goodales and Draper to redeem the mortgage in conformity with this position of his, and executed a quitclaim deed to them for their further security, which would have been unnecessary except under their idea, that Hunter had an interest in the farm; that the Goodales and Draper gave him some written obligation or bond afterwards, recognising an interest in him, and agreeing on certain terms to convey to him; and that in their hands, if not in Stow's or Bradshaw's, or the Coombses, the trust in favor of Hunter is not only recognised, but by a written declaration, and uncontaminated, as between them, by any original fraud between Hunter and Stow to injure Hunter's creditors by means of the trust between him and Stow.

I must confess, that the inclination of my mind on all this, though impugned in some respects by counter testimony, by obscurities arising from death of witnesses and lost papers, and by some uncertainties in the exact extent of this trust, is to hold, that facts enough are satisfactorily proved, and some of them in writing, so as in conjunction with Hunter's long and undisturbed possession, and the great disparity between the value of the farm and the sum stated to be paid for it in 1801, to show not only a secret trust originally existing between Hunter and Stow, but that it has been executed as between them so as to get rid of the original fraud, and a new one created on a new loan between Hunter and Bradshaw, recognised afterwards by the Coombses, the executors of B., and by the Goodales and Draper, their assignees. In some views the arrangements under Bradshaw and his assigns might be regarded as a continuance of the old trust, and thus tainted by its fraud, and not to be enforced. But in other views, which in my opinion are best sustained by the evidence here, though not entirely free from doubt, the arrangements with Bradshaw grew out of a new loan, were secured by some new conveyances and releases, and the old matter with Stow was intended to be adjusted, and any trust connected with it fully executed by Stow; and a new and honest one created between Bradshaw and Hunter, and continued under B.'s

grantees. Under this aspect the original fraud could not be interposed by B. or those grantees against the enforcement of the new trust. Flagg v. Mann [Case No. 4,847]. It had been perfected, executed, functus officio; and the new trust had a new and valuable consideration from new persons. Because any proceeding after that will not be between the parties to the original trust; nor their privies in estate as connected with it, but. between Hunter and the Goodales and Draper after Stow's trust had been executed through Bradshaw, and for a new and additional trust on a new loan by Bradshaw, and consented to by Stow. This was perfected and prolonged by new conveyances from Hunter and others to Bradshaw, and afterwards to the Goodales and Draper, and by new written recognitions of Hunter's interest by the Goodales and Draper, under their new deeds, if not a bond given back to Hunter.

But in inclining to these conclusions, I do it on facts which repel the idea that Hunter's possession for twenty years after his original · conveyance to Stow, strong proof as it is in favor of a trust in him, fortified by other circumstances, was of a character, under those circumstances, to raise the presumption of an absolute title in Hunter. For the possession, it turns out, was not hostile or adverse to Bradshaw, or the Coombses, or the Goodales and Draper, but in subordination to their title, as he often took leases from them, and often paid an equivalent for rent. Consequently it was no proof of such an absolute title in Hunter, but rather the reverse. See Bac. Abr. "Leases," (O); Co. Litt. 47 b; 4 Coke, 54 a; Cro. Eliz. 36; White v. Foljambe, 11 Ves. 337; 2 Ves. Jr. 304, 394. But in 1821 an event occurred which changed the whole aspect of the transactions, as well as Hunter's rights and relations to these premises, and made the previous portions of the case of little consequence, except as illustrating some difficulties that grew out of that event. They also render a decisive opinion on the trusts or frauds involved in them, not necessary in the final disposal of this case. I therefore shall not go into the other evidence about them now. In 1821, the Goodales and Draper. began to have some difficulties with Hunter, and pressed him for payment of what they had advanced for their interest in the bond, with their expenses. Hunter perceived if he did not make this payment, or obtain some other person to do it, and give him longer indulgence to redeem the land, or if he did not effect some new arrangement beneficial to him, he should be obliged to quit the possession of the farm soon, and derive no further advantage from the trust in his favor on ,the written bond or stipulation allowing him on certain terms to redeem. Among others, to whom he applied for assistance, under these embarrassments, was the town

of Marlboro'. The town, like others, declined to interfere, and did not until a plan was proposed by some of the inhabitants to purchase a farm for their paupers to live on and cultivate, and a committee was appointed to examine different places and prices, and a report made by them in favor of the purchase of Hunter's.

It is to be remembered here, that Hunter's farm was one obtained from his father under circumstances, throwing some doubt over the validity of the title, and which in fact led to a suit against the town after their purchase, involving it in expenses to near $1000 in amount. That, however long had been the possession of David in 1821, it had not been in his own behalf, all the intervening period, setting up an absolute title in himself, nor one against all the world; and though he may not have admitted then the validity of the claims by his father's heirs on all occasions, yet he did it on some, and, after the town purchased, encouraged some of them in their suit. New pretensions, affecting the title, had also sprung up from D. Hunter's deeds to .Stow and others,. and attachments by Stow's creditors and the validity of the sales under them, and if not good, the interests which would be then outstanding in Stow, and the rights which other creditors of his might acquire by new attachments, were agitated in the neighborhood. A knowledge of much of this situation of things probably helped to render the Goodales and Draper more disinclined to confide longer to their security, and increased Hunter's difficulties in procuring any person to advance to them what they claimed as due, and give Hunter further time and indulgences. A knowledge, also, of Hunter's character, somewhat shiftless and unthrifty, and with little or no means then, or in expectancy, to pay the incumbrances, unless the farm, under all these clouds, could be sold for more, assisted undoubtedly to prevent him from obtaining any money lender to comply with his wishes.

These considerations would operate on the town not to interfere as strongly as on an individual; and much more so when without any spare funds on hand, they must hire money to redeem the land with, and loan it out to Hunter at a like rate of interest, without any profit or gain to themselves, and probably without any legal authority, as a corporation, to borrow and lend money in that way. Consequently the town concluded wisely to do nothing on such an application, and it was not till the project was started soon after to purchase a town farm for paupers, which they were clearly authorized by law to buy, that any proposition appears to have been entertained to interfere in any way, or do any thing respecting his farm. What did they do then, and what could they legally do then? are the next important inquiries. Having ascertained the prices at which the Goodales and Draper

would convey, and those who had purchased Stow's outstanding rights or equity of redemption under an attachment and sale by his creditors, and having obtained a report on the validity of the title thus situated, they concluded, through a committee, to make these purchases of the title, and took deeds accordingly, and borrowed and paid the stipulated prices, falling in all a little short of $1500. But they took no deed from D. Hunter, though there is some parol evidence offered, that one of the committee stated in town-meeting that they had. There is no pretence they agreed to pay him, or did pay him, any particular sum for his claims on the farm in trust, or under his bond with the Goodales and Draper, though the balance of competent evidence is decisive that he made such claims, and that they were probably evidenced by a bond, and that he placed some value on them. It is further manifest, that the farm was then considered by the town to be worth some hundreds of dollars more than they had given to their grantors, though not so much more, as since or now, the wood on it having since risen greatly in value, and the title being settled as to the other heirs of D. Hunter's father, and new buildings and valuable improvements added. It is also clear, that considerable sympathy was felt for Hunter by many of his townsmen; that they were willing to aid him so far as they might legally and safely; that he and some of his family were in danger of becoming chargeable to the town as paupers, if driven from the farm without any compensation for his claims; and that a compensation was talked over between him and some of the committees of the town, appointed to purchase a pauper farm, and another afterwards appointed to provide for him; and that some arrangement at least, if not an agreement, was made as to what should be done for him, which was at first satisfactory to both sides. But here the great difficulty in this view of the case arises. What was the agreement, if one was made? and has it been fulfilled? and if not, is it so proved, under the statute of frauds, that this court can compel its performance?

I am satisfied, on the whole evidence and circumstances, that no agreement was then or afterwards made to continue or carry into effect the trust or mortgage, which had before existed between Draper, the Goodales, and Hunter. Firstly, because all the writings that existed before between those parties, were given up and cancelled; and no new ones of like character were executed or proved to have been agreed to be executed between the town and Hunter. Secondly, because it would have been then, and would be afterwards, suicidal to the whole object of the town in purchasing a pauper farm and making extensive improvements on it, to continue a former trust or mortgage, and buy the farm with an arrangement to let it be taken away from them on the payment of what they had advanced. They might thus not only lose what they had bought with a view to keep permanently for the use of all their paupers, but in the mean time, till redeemed, Hunter would be turned out of possession, and have no place to live on, and no land to cultivate, and would be obliged literally to go into the common poor-house for support. The strongest evidence would be necessary to satisfy a court of such an inconsistent contract. But in order to prevent both of these undesirable results, it was natural to agree to pay him in some other way for claims existing, and for rights recognised and surrendered, and it was natural for him not to relinquish such claims and rights without receiving something in compensation for them. And as the town had no money but what it borrowed, or raised by annual taxes, and as the farm was large, and the price given by the town did not equal its full value, it was better for both parties, and to be expected that they would agree, Hunter should have the rest of the farm, after setting off enough to the town to satisfy them for all they had paid for it, and the cost of providing some new buildings for Hunter. This is the more likely, too, as then land enough would probably be retained by the town for the purpose of a pauper farm. This would also pacify Hunter and his friends, as Hunter seems to have been clamorous and persevering in setting up even to the town a paramount title in the farm over the Goodales and Draper, or any other claimant, as well as insisting by memorials to the town, and articles in the warrants, to have some provision made for himself. It is, also, very questionable, whether in law the town was authorized to make a different arrangement and borrow money, and invest it so as to let it be repaid in a certain event, or if it was a loan, secured by mortgage. It is certain that they took legal advice in the matter, had one lawyer, Mr. Draper, on the committee, and that no evidence on either side, as to what took place between the town and Hunter at the time of the purchase, tends to set up a contract for any permanent arrangement, different from that before indicated, and which alone is described in the bill as having been actually made. The bill seems rather to go for the other object, the mortgage and trust, not because it was then arranged or agreed to, or was likely to be, but because the contract then made has not been fulfilled by the town, and therefore inferring that the old trust and mortgage by the Goodales and Draper had revived. But this last position does not seem to me tenable under the supposed agreement. If the agreement, made by the town, was such as to terminate and extinguish the previous trust in the farm, in which it stood with the Goodales and Draper; and if this agreement is properly proved, so as not to be open to objections coming within the statute of frauds, which is here pleaded by the town,

it must be executed by this court if duly requested in the bill to execute it, unless it appears already to have been substantially performed.

One of the peculiar provinces of this court, sitting in equity, is to enforce the specific performance of contracts as well as of trusts; when such contracts are broken, they are, as a general rule, to be enforced and not rescinded, unless fraud or mistake appear, and they are to be enforced by a specific performance, unless that has become impracticable, and it is a case where damages can be substituted. The difficulty then, in my mind, in relation to some agreement by the town with Hunter, to provide for him a house and land to occupy, is not much as to its existence, but as to some of its provisions in the detail. This arises from the absence of any writing, purporting to be the agreement itself, or a copy of it, and after the lapse of near a quarter of a century to obscure the parol evidence of it. The arrangements to provide for Hunter, as set out in the bill to have been made by contract, are to some extent admitted by the town in its answer. But they are averred to have been not so extensive, or on the same principle, as to the quantity of land to be set off to Hunter, nor made in consequence of a contract between them, but merely as a favor to Hunter, a kindness in conformity to the report of the committee, made Nov. 19, 1821, under an appointment in September previous. The precise differences between these parties, as to the extent and character of the agreement, if one was made, as to his having a separate house and barn and piece of land, are as follows, and are very material. The town insists, that no agreement was made with Hunter, except to let him remain in his former house on the farm for one year, and that in no subsequent arrangement was this agreement extended to any thing else. But they admit, that, in consequence of a subsequent report of a committee, Nov. 19, 1821, on their difficulties with Hunter, just referred to, they voluntarily, and without any contract or obligation on their part, provided for Hunter and his children another house and barn, and set off a part of the farm for them to occupy during the pleasure of the town. On the contrary, the complainant insists, that an agreement was made by the town, through a committee, not only to let David Hunter remain one year in his former house, but a further and separate agreement, that the town was to retain only enough of the whole farm to form a suitable pauper establishment, and pay for the sums of money which had been advanced to obtain the title, and satisfy the expense of providing another house and barn for Hunter, and convey the residue to him. To settle which party is correct as to these differences, is very difficult, not only from the reasons before named, of the lapse of a quarter of a century, and no agreement being found in writing, except

one for a year's occupation of the former house on the farm, but from the inability to find any, except one of the reports of the several committees on this subject, made at the date before named.

Under these circumstances, like many others in cases in equity, it is more difficult to settle the facts than the law arising upon them. Without much experience as a juror, I shall attempt from rather meagre and questionable materials, to eviscerate the truth as to this point. In the outset, it is due to frankness to say, that though I have come to a conclusion unfavorable to the town on these differences, yet the only written report of any committee, being that just referred to, tends to sustain the views now taken by the town. I give the whole of it on this point in a note.[2]

It is pretty clear, from this report, that this committee do not recognise any previous contract with Hunter by the town, nor recommend one for the future, but rather a permission to him to occupy a part of the east end of the farm, and to have a suitable provision made for his residence thereon. Nor do the committee speak of any agreement that had been made by any previous committee with Hunter in relation to this subject, except probably the agreement as to his remaining in his former house one year. Yet the town were aware of some arrangements or agreements made by another committee, for they not only voted to accept their report, 19th Nov. 1821, the day it bore date, but "voted to choose a committee of three by ballot to provide a place for David Hunter and family, agreeably to the agreement made with David Hunter by the pauper committee." That was the committee selected nearly a year before to purchase the pauper farm. They also voted, that this committee be authorized to exchange certain town buildings, or exchange them "for another tenement to

<hr/>

[2] "The third article referred, is to see if the town will do any thing for the relief of David Hunter or any of his family. Having been made acquainted with the course which said Hunter has pursued, and is still pursuing, your committee feel much at a loss what to say on that subject. But considering that he has parted with his farm imprudently, and for a small consideration, and that the town is now in possession of the same, for several hundred dollars less than it is fairly worth, and also that the easterly part of said farm may be set off for the improvement of said Hunter and family, without material injury to said establishment, your committee have concluded not to visit the iniquities of the father upon the children, but to adopt a more benevolent principle of doing to others as they would wish that others should do unto them; and would therefore recommend to the town to permit said Hunter, with and for the sake of his family, to improve a portion of said farm by himself, and also to make suitable provision for his residence thereon; and that he be permitted to remain where he now is, with his family, (under the agreement made by the town,) until other accommodations be made, provided he does not interfere with, or interrupt the rights of the town, in the management of their establishment."

accommodate said Hunter, or to purchase or build for said Hunter's accommodation, as they may think best for the town, and that the town treasurer be authorized to give a title-deed of whatever said committee may sell." It is certain, then, that one of these votes of the town recognises an agreement with D. Hunter by the pauper committee, "to provide a place for D. Hunter and family," and appoints, by formal ballot, a new committee to execute it. This looks like something different from the agreement for a lease for one year. Their report is not in evidence, and no proof is given of its contents or of the contents of any agreement with Hunter, except that lease and the scattered fragments which have been, and will be alluded to hereafter. From all of these, what probably were its contents? It seems from the next vote, that it related to the procurement of another tenement for Hunter's accommodation, by exchange, purchase, or building; and whether the close of it, as to giving a deed, embraces what might be sold to Hunter, or conveyed to him under the agreement, is doubtful, though the language is broad enough to cover it, provided such was in truth the tenor of the agreement.

By the journal of the committee, it would seem, that an agreement was made, or lease given by them for Hunter to remain there a year, &c., "or until another house is provided for him to go into." It is possible, that the town intended to refer to that agreement, and to the procurement of another house for him before the year expired. But the language in the vote of the town seems to look beyond a house alone, and beyond its use for only a few months, then remaining of the year; and the facts on which was founded the intervening report of the other committee, Nov. 19, 1821, recommending setting off land for Hunter, as well as procuring buildings for him permanently, would seem to furnish sufficient ground for the formation of some new agreement, or the recognition of some old one more comprehensive, but nowhere fully explained in any written document. For the purposes of this inquiry, and under my views of this transaction, it is not material whether the agreement was made, when the town took the deed from the Goodales and Draper; or when D. Hunter, in the fall of 1821, and spring of 1822, made difficulties about his interests and claims, and the town appointed a committee to provide a tenement, &c. for him. At either time, and under either views, there were ample consideration and motive for it, though if the allusion by the town in November to an agreement, as made by the pauper committee, was meant for this, it would lead to an inference, it had been made when the committee bought the title of the Goodales and Draper at Hunter's request and earnest entreaty. If we were in this particular examining the question of a mortgage or not, and of a trust or not, the date of the agreement might be of more consequence; but to fix it with exactness, does not, as before remarked, seem material in the view I am now taking of the transaction. It seems that various other votes by the town followed, and further difficulties with Hunter, and various conferences between him and the committees on several occasions took place, till, on the 6th of May, an adjustment of all accounts and other difficulties appears to have been completed; and either some old or new agreement was carried into effect to a great extent, and which seemed for a time satisfactory. But strange as it may appear, the extent and nature of it, whether sustaining the views of the plaintiff or defendant, is to be gathered more from what the parties then actually did, illustrated by their existing relations to each other and former difficulties, as well as by their subsequent acts, than from any further written reports, or deeds, or any very clear statements of witnesses. They proceeded to purchase a house for Hunter, and set off a tract of land, with his presence and acquiescence, and begun the erection of a barn, which was afterwards completed. Hunter and his family, soon after, removed to their new establishment. But neither the committee nor the town gave any deed to Hunter, and he soon expressed dissatisfaction and complained of their conduct. Over twenty-four years having since elapsed, it is difficult to ascertain with exactness what all the particulars of the final agreement were, and of what he complained, except from the acts of the parties, nearly contemporaneous, and the statements of one side, not then denied by the other. The acts by Hunter in making objections so soon after being present at the setting off, and having quietly removed to the premises, did not probably relate to the quantity of the land, or as not conforming to the contract, in regard to the house and barn. But if it related to the want of a deed of the land, then it was well grounded, supposing that giving a deed was a part of the contract, it being conceded that no deed had been executed. The stronger probability then is, it was on that account.

Again, as to evidence about this, derived from other acts by the town or its agents, some of the inhabitants of the town, if not all of them at the meeting, where one of the committee stated Hunter had made a conveyance to the town, acted in closing the purchase on that fact, as if he had agreed to the sale to the town, and the surrender of his old claims on certain terms, and Hunter would not be expected to give a deed to the town, unless they had agreed to give him something in return, and probably a conveyance of what he was to receive from the town, in consequence of his deed. It is also probable, that the Goodales and Draper conveyed to the town under an expectation that Hunter was to derive some substantial benefit from it by some new agreement, made with him by the purchasing, or, in other

words, the "pauper committee." Manifestly this was their desire, and they acted also by Hunter's request, and for his benefit as well as their own. Again, the committee appointed in September, 1821, reported in November, that the town had paid for the land some hundreds of dollars less than its true value, and hence could afford to deal liberally by him and his children, but unless agreeing to give, and actually giving him and his children a title to these premises, the speculative or contemplated liberality towards them would rest on too great uncertainty, in the mere pleasure or caprice of the town in future, ever to be of much real value, or be likely to prove acceptable to Hunter and his family. This kind of provision for him, without giving him any title, was too much in the form of a mere pauper to correspond with his expectations or claims, and especially is too much so, for gaining full credit, if we look to what has already been specified, and also the doings of the town afterwards in 1833, appointing a committee to settle with his heirs, and some of them proposing to give $1000, which was refused.

These last proceedings are not evidence against the town, as having offered or authorized any particular sum to be given, or to bind them by offers of a compromise. 2 Pick. 290; 4 Pick. 377; 1 Metc. (Mass.) 479. But they are proof, that both parties considered the heirs to have claims against the town unsatisfied, and estimated at a considerable value. Again, another agent, the principal man of the purchasing committee, Cranston, admitted about the time of the removal, that "when he traded with Hunter, he had promised to build him a house;" and again, "we were to build him a house, and set him off a piece of land." Added to all this, in confirmation of the idea of a promise or contract to provide a house and barn for him, and set off a certain quantity of land from the farm, are the circumstances and acts which took place before the conveyances to the town, and which have been heretofore enumerated, and the intimate relations in which Hunter and the town stood towards each other in respect to the purchase. Again, Hunter would not be likely to relinquish his former rights under the Goodales and Draper, without some title to the new house and land, beyond that of a mere tenancy by sufferance or pleasure. Though troubled to get persons to come forward and extend a loan to him. longer, one of the committee testifies, he expected to realize something from his farm after paying the outstanding claims.

The position in favor of an agreement, that a deed was to be executed under the contract as finally settled or finally recognised, and as a matter of right, is strengthened by the evidence, that Hunter's statements to this effect, made at or near that time, were communicated to this same Cranston, one of the purchasing committee, and not denied by him. These statements are not admitted as Hunter's declarations, and, as such, binding on the town. In that view, they may not be competent, and are not very trustworthy in and of themselves. 10 Paige, 181; 10 Ves. 517; Dexter v. Arnold [Case No. 3,859]. But as statements of the contract by one party communicated to the agent of the other party, and not denied, they have some force. That communication and neglect or refusal to deny them is an act of the agent, who assisted in the business, which raises some presumption of their truth; though such statements are not competent when made at remote periods, or on other matters. 24 Pick. 38, 39. Again the town, by allowing Hunter and his family to remain there so long, and notwithstanding the quarrels with them on his part, have given countenance to the hypothesis, that such an agreement existed; and though no actual execution of a deed of the premises took place, they have allowed an adverse possession to run on, till a title is contended to have vested in the heirs of Hunter without a deed. Finally, it is not without its influence on my mind in favor of such an agreement having probably been made, because it is the only one which seems to accord with the justice as well as the nature of the case. It recognises some rights in Hunter, which were not fulfilled throughout by the town as bound to corresponding duties, and thus accounts for the dissatisfaction of himself and heirs. But, at the same time, it exacts from the town no severe penalties, as its inhabitants seem to have given to Hunter and his children the long and uninterrupted possession of all to which they should have conveyed the title. I am aware that the complainants deny this, and the grievance of which they chiefly complain in their bill is, that the town did not fulfil its agreement in conveying to Hunter land enough, or, in other words, reserved to themselves more than sufficient to pay them for the sums they had advanced and expended on Hunter's account. But the town certainly proceeded at once, in May, 1822, after the difficulties seemed to be arranged, to procure a house, and repaired it, and built a suitable barn near. It also set off to Hunter, by metes and bounds, from thirty to thirty-five acres of land; and the weight of testimony, though under some contradiction, is, that Hunter was present and consulted as to the division line established, and then made no objection. It is further proved, that Hunter so far accepted of the house and barn and land thus set off, as to remove to them and occupy them during his life, and his heirs since, for near twenty years, or more than that time, before this bill was filed.

All this would be decisive of the case throughout, and show an entire fulfilment of the agreement, had the town executed a release or conveyance to him in fee, of the house, barn, and land so set off, and he made a quit-claim to the town of his interest or claim in respect to the residue. In this

view, it is of little consequence whether the agreement as to the quantity to be set off was as set out in the bill, or as the town might think sufficient, since, whichever it may have been, Hunter would be regarded by the acts before specified, as having accepted the land and buildings as a performance of the agreement in respect to the kind and quantity contemplated. The quantity seems to have been acquiesced in by Hunter till he or his heirs considered the failure of the town to fulfil all their agreement, as an abandonment of all, and then, under that mistaken conclusion, making some claim to the whole farm under the old trust, which had been surrendered and extinguished. Furthermore as to this view, there having been a mutual participation in setting off what has since been occupied, and Hunter having removed to the land without then demanding more, he must in equity be considered as acquiescing in that quantity when it was set off, as a compliance with the agreement with the town. It was a virtual acceptance of it, so far as regards quantity and notice, by uniting in the setting off, and removing from the old buildings and the rest of the farm, and cultivating afterwards only the land so set off.

Finally, how do the probabilities of all the case bear on this hypothesis, that the quantity was then likely to be deemed sufficient with the house and barn, to answer in that respect all which the town had agreed to do, even on the complainant's view of the contract? Some of the witnesses state, that the buildings and lands thus assigned to him were worth $500. Now, if we consider that the town had then paid about $500 in cash for the claims to the whole farm, when nobody could be obtained by Hunter to do as much; that the title was so far in doubt, the town afterwards was obliged to expend near $1000 in its defence; that the farm was then worn out, the buildings poor, and the woodland on it of little importance so soon after the great gale of 1815; it is certain that not so much as $500 could then be obtained by Hunter elsewhere for his interest in the farm, and it is hardly questionable whether $500 in value in land and buildings was not then a fair equivalent for the claims or trust of Hunter, looking to all the circumstances and the positive evidence as to the low actual sales of other farms about that time, which were situated near. As things are now, it would certainly be insufficient. But as they were then I could not say they were so far insufficient as to indicate the want of assent by Hunter, to the quantity and value, as a compliance with the contract in that respect on the part of the town, much less could I say it, considering that he united in making it, and in taking possession of it, whether it was by the agreement to be the exact quantity left, after appraising enough to the town to pay it, or was to be sufficient to satisfy and accommodate Hunter. If he

did not unite in the setting off, and occupy the premises under the contract, and as a compliance with the quantity to be set off, why did he unite at all in the setting off? and why did he remove to it? and why did the town desire him to do either, if it was not to go towards the discharge of their obligation to him? Nor was it a temporary arrangement, with a more formal and subsequent appraisal to follow, as there is no such evidence, and a final appraisal could as easily be made then as afterwards, and no reason is assigned for postponing a final agreement on either side to some future time. My conclusions then, are, that the town must be considered, on the balance of all the evidence, as having fulfilled the only contract, which remained in existence for them to fulfil, except conveying a title in fee of the land and buildings then set apart to David Hunter and his heirs. This title, I think, though under some contradictory presumption and evidence, Hunter expected they had agreed to convey, and had a right so to expect, and hence they ought now to convey it to his heirs; and are in default for not having conveyed it before.

If the evidence was more doubtful as to the special agreement by the town to give a title to this land, it ought now to be done after allowing so long a possession. Alexander v. Pendleton, 8 Cranch [12 U. S.] 462. It would be just as if the present was a bill of peace, quia timet; because the plaintiff is in possession, and fears being disturbed. An injunction, if not such a bill, is often proper to prevent future litigation and wrong after so long an acquiescence. Welby v. Duke of Rutland, 2 Brown, Parl. Cas. 39; 1 Atk. 285; 2 Atk. 483; 2 Story, Eq. Jur. §§ 703, 707, 826, 827, 853; 2 Schoales & L. 208; Com. Dig. "Chancery," (D) 13. Though the bill itself does not request any such remedy for such a cause, it asks for all relief proper in the premises, and this can therefore be given, it being appropriate. English v. Foxall, 2 Pet. [27 U. S.] 595; Watts v. Waddle, 6 Pet. [31 U. S.] 389. But one, inappropriate or disconnected, cannot be given. Wilson v. Graham [Case No. 17,804]. The town has not, in its answer, pleaded the statute of limitations, or set up any defence from length of time to such a conveyance, as must be done to make time a bar. Brown v. Jones [Id. 2,017]. But in this particular it has merely denied any contract to give a deed. If they had set up the length of time, the allowance of an exclusive occupation by Hunter and his heirs of these premises so long without interference, would go far to rebut it, and to show the town admitted their title, or at least their right to a title. The town has interposed the length of time against executing the original trusts by Stow or Bradshaw, or the Goodales and Draper.

And the plaintiff, in reply, contends that a trust once clearly established is not affected by the lapse of time, unless repudiated or disavowed openly, and this is brought home to

the cestui que trust, and that the statute runs only from such clear disavowal. Baker v. Whiting [Id. 787]; 17 Ves. 97; Boone v. Chiles, 10 Pet. [35 U. S.] 223; Zeller's Lessee v. Eckert, 4 How. [45 U. S.] 289; Girod's Case, Id. 561; 2 Story, Eq. Jur. § 734; Ang. Lim. 485; 5 Brown, Parl. Cas. 187. But whether since any such disavowal, sufficient time has run to bar any trust here, it is not material to settle, as we have already seen that any trust existing at the time of the purchase by the town in 1821, was not assumed or adopted, but deliberately extinguished or surrendered by Hunter on a new contract made by and with the town. The failure by the town in that and the subsequent year, as well as since, to execute the whole of that new contract, does not, we have before said, revive the old trust, as supposed in the bill, and thus render it necessary to decide on the bar to it by the length of time interposed in the answer. No fraud or mistake are proved in the adjustment of the old trust, so as to re-open it. And a failure to fulfil the terms of that adjustment, instead of avoiding it, merely gives to the other contracting party either a suit at law for damages, or as before explained in equity, a right to have the new agreement carried out in full by a decree of a specific performance of what still remains to be done, and against doing which no bar by length of time is interposed in the answer.

There are some other considerations connected with this case of a more miscellaneous character, yet still important in their bearing, and to which I will now devote a few moments attention. Thus in respect to David Hunter's capacity, about which considerable is said in the bill, answer, and evidence, I do not, in connection with this question or the case generally, think it was such as to impair the validity of any of his contracts; nor such as to justify the town in taking charge of him and his property as an idiot. He was not so imbecile and weak as not to be trusted with making his own contracts. 1 Story, Eq. Jur. § 234–239. But his character might make him more liable than people in general, to confide implicitly in supposed friends, and to be more careless than most people in having his papers in legal form, and in preserving such as were valuable. And in my view, this character of the man rendered him more anxious to fall into the hands of the town, and less mindful of having his engagements with its committees reduced to writing at first, and accounts for some of the looseness apparent on that subject. So all the doctrines may be sound law, which have been agitated as to what is evidence of a trust or mortgage, and what takes such a trust, in respect to real estate, out of the operation of the statute of frauds, if those doctrines are limited in this way. That is, possession by a grantor, being evidence of a mortgage, if continued after a sale, or if interest is paid by him. Finch, Prec. 526; 1 Madd. Ch. Prac. 517. Or inadequacy of consideration being evidence of a considerable weight, when coupled with an application for a loan, to show it was a mortgage. Lewis v. Owen, 1 Ired. Eq. 290; Morris v. Nixon, 1 How. [42 U. S.] 118. Or recognitions of trusts by any independent writings being sufficient to bar the statute of frauds, as to parol agreements, the proof being then in writing, which is all required, though the trust itself may have been otherwise created. Barrell v. Joy, 16 Mass. 221; 10 Law Lib. 81; McCubbin v. Cromwell's Ex'rs, 7 Gill & J. 157; 2 Ves. Jr. 695, 708; 4 Kent, Comm. 305; 1 Johns. Ch. 273. Or part performances being enough to take a parol trust out of the operation of the statute of frauds. 6 Ves. 12; 1 Ves. Jr. 326; 6 Johns. Ch. 111; Jenkins v. Eldridge [Case No. 7,267]. There are doubts on this at law, but not in equity. 1 Pick. 328; 20 Pick. 134; 1 Metc. (Mass.) 483. Or the clear proof being competent of its being a transaction to lend and secure money in the opinion of a court in equity. 1 Story, Comm. § 1020; Strong v. Stewart, 4 Johns. Ch. 167; 1 Ired. Eq. 369; Flagg v. Mann [Case No. 4,847], 1 How. Pr. 358. Though a qualification to this may be proper, such as if this can be so shown or proved without any violation of the statute of frauds, pleaded or relied on against it. 14 Pick. 477; Flint v. Sheldon, 13 Mass. 443. As if a defeasance was omitted by mistake or fraud, or the other circumstances are proved, which have before been alluded to as sufficient. Cholmondeley v. Clinton, 2 Jac. & W. 182; 2 Story, Eq. Jur. § 1013; 4 East, 577, note; 4 Russ. 425. Or payments of the consideration in a grant of land, if made by a third person, being in law sufficient to raise a resulting trust in his favor. Flagg v. Mann [supra]; 1 Sand. Uses & Trusts, 227; 11 Johns. 96; 2 Story, Eq. Jur. § 755; Scoby v. Blanchard, 3 N. H. 176; Pritchard v. Brown, 4 N. H. 401; Sugd. Vend. 416; 10 Ves. 511; 15 Ves. 50; 5 Johns. Ch. 1; 2 Johns. Ch. 405; 1 Johns. Ch. 582; 3 Ves. 707, 712; Smith v. Burnham [Case No. 13,019]. But you cannot prove a resulting trust, by parol, in any other way (2 Johns. Ch. 205; 1 Eden, 515; 4 East, 477), than paying a consideration, or possibly conveying without consideration (20 Pick. 404).

Some of the former trusts, as to Stow, Bradshaw, the Coombses, and the Goodales and Draper, are quite clear from several of these circumstances, as well as a writing or bond by the Goodales and Draper. But here, the transaction between the town and Hunter, which succeeded and was substituted for the others, is proved and sustained under the statute of frauds, by a part performance, having such a contract in his favor, which has before been mentioned, and not a mortgage or trust, resulting or otherwise. It is proved by a part performance, as well as in part by some notes in writing, and on the records of the town. Some of the necessary ingredients are wanting, as between Hunter and the town, to show a trust or mortgage, though

none are as between Hunter and the Goodales and Draper. But none of the necessary ingredients are wanting between Hunter and the town, to take this new contract out of the statute of frauds, as a contract, not a mortgage or trust, but still a contract in respect to some interest in lands. Because it was speedily and deliberately executed in part, and, however at law in some states, as in Massachusetts, a part performance may not be regarded as sufficient to take out of the statute a parol contract as to the interest in lands; yet in equity, where the present case is now pending, no doctrine is better settled than that part performance is sufficient to satisfy the demands of the statute. See cases before cited. If, after so large a part performance as here, of a contract like this, a court of equity were not to require a further and full execution of it, nor remit the complaining party to his original rights under the former trust, it would make the statute of frauds, if resting on that as an excuse, an instrument to work fraud rather than prevent it. Especially is the case supported sufficiently, when to this is added, several votes and records of the town strongly indicative in writing of such an original agreement with Hunter, substantially, as the bill alleges. Length of time, however, is interposed here in a special plea, as a bar to the fulfilment of this contract. Time is not always the essence of a contract, and especially if no change has happened in the value of the property, or situation of the parties, rendering a fulfilment just or proper. Brashier v. Gratz, 6 Wheat. [19 U. S.] 528. Here time has had no effect on the giving of the deed, being all which remains to be performed, except to render it more proper, rather than excusing it.

In fine, I am satisfied, that the view taken by me concerning the agreement, is the only view of the matter which can be sustained by the evidence, and which is competent and legal in this class of cases, so as to permit any relief whatever to the plaintiff. And though this relief is a small one, considering the length of possession, which has been enjoyed, yet it is a relief in conformity with what the contract was and what it required, and what appears already to have been done by the town, and which may at least prevent future litigation as to the title of the premises set off. In short, also, it is a relief which, if given at the time by the town, vesting an absolute title then in David Hunter, to what was set off, would probably have satisfied him, made him in some degree independent, and prevented the long and expensive litigations and heart-burnings since existing between the parties. And it is one, which it is equitable and just to require of the town, when by letting the heirs remain there so long, the town has allowed an expectation to be formed that the title was to be vested in David Hunter and his heirs, and by thus strengthening the idea set up in the bill of

their original agreement to convey such a title, the town cannot complain of being now required to carry that agreement into complete effect.

The misfortune in the disposal of this case will probably be, that neither party will obtain what it asks, and thus both be disappointed; and besides this, that the expectation of the parties on both sides are raised so high, and they have litigated their claims so long and with such zeal, they neither of them will be satisfied with moderation and the smallness of the relief granted, but look to the whole or nothing. But if the relief shall go to the extent of the evidence and the law, as well as the justice of the case, the court will be content under the severe labor, which the hearing and investigation have required from it. Some doubts have occurred, whether the bill is in a form, under which a specific performance of this agreement can be decreed, even to this extent, as the specific relief asked for is rather to enforce the idea of a mortgage or trust than this original agreement, as set out. But as the bill asks likewise for any other relief proper in the premises (see Mitf. Eq. Pl. 38, 39); as it deems the existence of this agreement a contract and avers a breach of it; and as the court is satisfied that such an agreement was made, and if made, the answer admits and all the proof corresponds, that it never has been entirely fulfilled; I think it proper to decree; that the town proceed to execute a release of all its interest in the premises in controversy, occupied by David Hunter and his heirs since 1822; and thereupon that the complainant, representing said Hunter's heirs, release to the town his interest in the rest of the farm in conformity to what was originally stipulated. Let a master be appointed to see these conveyances prepared and executed. Costs for the complainant.

After the opinion was delivered in this case, and a decree made, a petition was filed for a re-hearing. It stated no new evidence discovered, nor any supposed mistake in law or fact, but asked for leave to have re-examined and decided the points, whether the land and buildings assigned to David Hunter were so much in value as ought to have been awarded to him, and whether he had ever actually accepted them in satisfaction of the agreement. It was argued that as the relief asked for, and the arguments were not directed mainly to these inquiries, they ought to undergo further consideration and a revision. But the court held, that the grounds assigned were insufficient to justify the grant of a re-hearing. It was not set out, that any new testimony on those points had been discovered since the opinion was pronounced, or could be furnished; or that any thing else had occurred which would justify a new trial in a case at common law. That was one test in such applications, and

a very important one. Doggett v. Emerson [Case No. 3,961]; Emerson v. Davies [Id. 4,437].

The application rested merely on the ground, that the complainant supposed sufficient attention and argument had not already been given to the evidence, concerning the value of the farm, compared with the advances made by the town, and concerning the object of Hunter and the town in having the tract set off and buildings provided by the town for him, and the acceptance thereof, in fulfilment of their contract. It is true, that the counsel for the complainant introduced much evidence in the case, and argued it as to that value, chiefly with a view to the question of a trust or mortgage, to be inferred from the difference in the value of the farm, from the sums advanced by the town; and it is equally true, that the evidence and argument on the other side, as to that value, were devoted chiefly to the same question. But the evidence as to the value and the arguments on it were, in truth, very full, and were much considered by the court; and whether they are applied to the question of a trust, or the fulfilment of a contract to convey to Hunter all beyond a certain value, is immaterial, if nothing new can be added to it, and it has already been commented on and considered deliberately in this connection. In respect to the other question, the acceptance of what was set off to Hunter, as a fulfilment of the contract by the town, the court suggested to counsel, during the hearing, the importance of it, and fully examined the value of the whole premises in 1821, as compared with what the town had paid, in order to see if such acceptance was from that circumstance probable or improbable. After so long a lapse of time, and so great a change in the intrinsic value of the farm, and of the goodness or certainty of the title, it would not be safe to disturb such a transaction for any small difference in opinion now as to value at that time; and it is a controlling fact on this question; admitted by the complainant, as well as proved by the respondents, that Hunter then tried in vain for some time, to procure any person to give so much as the town did by this arrangement. If the farm was then under any circumstance worth more than they advanced in money to others, and set off to Hunter in land and buildings, why did he not succeed in getting more? Why could he not get even as much after repeated trials and considerable delay? This application for a rehearing is, therefore, not granted.

Another question has been raised, since the opinion, as to cost. It has been argued at length on both sides. The complainant claims full costs, while the respondents object to this, and ask, as equitable, a division of the costs or an allowance of none to either party. The rule at law to allow cost to the prevailing party, is, to be sure, not universal even there. But it is primâ facie to govern; and unless exceptions are shown, the costs follow the judgment on the merits. If the court have no jurisdiction,—see cases in Burnham v. Rangeley [Case No. 2,177],—or different issues are found for different parties, the general rule yields,—9 Gill & J. 115. So there is one case at law, where, by express statute, a plaintiff is not only deprived of cost, though allowed to have judgment for his debt, and where, though the defendant is found to be indebted to him, the court is authorized, in its discretion, to make him pay costs to the defendant. It is where a creditor sues in this court, and receives less than $500. See Act Sept. 1789; 1 Stat. 183. But I do not see, that this furnishes any analogy to assist us here, as there the loss of cost is imposed as a penalty for suing here, when his debt was not large enough to justify his resorting to this tribunal; and the payment of cost to the defendant, in the discretion of the court, is to punish the plaintiff further, if he has been guilty of bringing in the defendant for a frivolous claim, that could have been more cheaply and appropriately settled in some other court, or has been brought here with an apparent view to vex the defendant with additional expense and inconvenience in defending here, rather than in some state court. But no notice of that kind is manifest, and none could in this case be gratified in this way if it existed, when the defendant is situated so near, and the evidence is taken entirely in depositions.

In equity, the departures from the general rule are more frequent than at law, and extend to several classes of cases. Thus costs, there, may be given to neither party, or some to one and some to the other, or all to one side, as the justice of the whole case may seem to demand. Brinckerhoff v. Lansing, 4 Johns. Ch. 79; Saunders v. Frost, 5 Pick. 272. Some decisions seem even to look to the hardships of the case as one guide. Shaver v. Radley, 4 Johns. Ch. 310. And at one time in England, mere "conscience was applied to fixing the amount so to be paid." 1 Spence, Eq. Jur. 392. Under this rule, the cost was made less, for the "wrongful vexation" by the defendant, "in respect he hath married the defendant's daughter." See a case A. D. 1590; Id. note. This is a looseness in discretion hardly to be tolerated in this age. Any discriminations of a more equitable character are very troublesome, and frequently require a re-consideration and re-argument of almost the whole cause, in order to balance or fix the preponderance of merits beyond the naked decree entered by the court. And this course has proved so embarrassing as to have caused regret with Lord Eldon, that the same rule was not allowed to prevail in equity on this subject as at law. 11 Ves. 458, 462, note; Beames, Costs, 61, 62. So, then, it is settled, that though costs are discretionary in chancery (Bromley v. Holland,

7 Ves. 3; 11 Ves. 462), yet they go to the prevailing party in equity as at law, primâ facie (7 Ves. 3, note; Vancouver v. Bliss, 11 Ves. 462; Saunders v. Frost, 5 Pick. 260; 11 Pick. 446–449; 23 Pick. 508; 1 Hopk. Ch. 344; 2 Banb. Ch. Prac. 321, 322; 2 Madd. Ch. Prac. 554, 555). And though if both parties are in fault, the court may give cost to neither. 5 Pick. 274; Crippen v. Heermance, 9 Paige, 211; 4 Johns. Ch. 79; 2 Madd. Ch. Prac. 554, 555. Yet of two innocent persons, the burthen of cost must fall on him, who undertakes to give a title to another, which he does not give. Edwards v. Harvey, Coop. 40. More especially is this the case if the unsuccessful party knew his obligation or was bound to know it, having made the contract himself, and not a testator or third party doing it. 11 Pick. 446. Though the town here acted by agents, and they often change, and may be capricious in their course, yet the town was bound in this case to fulfil their contracts, and probably knew the whole extent of them. True, it has further been held, that if one fails in the substance of his claim, his costs may be restricted. The Packet [Case No. 10,655]; 1 Paige, 192. Or costs may be given against him. 13 Price, 500. Yet, then, it will not be reasonable to do it, if the other party contested some points, which were material, and to which the evidence and cost are pertinent. 10 Price, 62; 2 J. J. Marsh. 443; 3 A. K. Marsh. 368; 1 Dana, 331; Jac. Ch. 574. Nor if the defendant is in default or wrong, though the sum recovered be small. Smith v. Lloyd, 10 Price, 62.

In the equity courts in this country, the discretion used has been broader than in courts of law; but I think not generally so wide and minute as in England. The inclination should, in my opinion, be to conform to the standard established at law, unless in extreme or strong cases. Hence, when the final and sole decree on the merits is for one party, full costs should usually follow for that party. Here, too, no technical issues were formed, some of which were found for one, and some for the other party, and thus justify costs for each, where prevailing. But the question presented by the bill and answer was a single one, in regard to a failure by the town to perform all its duties and obligations to David Hunter, and a final decree was entered on that alone. It is true that several transactions were necessarily to be considered in deciding that running through near a quarter of a century, and some different positions were assumed in respect to what particular act or obligation the town was deficient in under its agreement, in 1821. But still the rights of Hunter, first in trust or mortgage, and then as entitled under a specific contract, substituted for the trust or mortgage, were averred in the bill, and sustained by the court; and the only departure from the leading positions of the bill was,

that a neglect by the town to fulfil that specific contract did not revive the former trust or mortgage, but merely gave a right to redress by a suit at law, or in chancery by specific performance, rather than an enforcement of the former trust.

The great controversy in the cause was, therefore, sustained by the complainant, an obligation to him by the town not fulfilled. But the quantity and form of redress were, to be sure, not such as he contended for, not so much land or money as he expected, and not by a trust or mortgage, but a specific performance of a contract which had been agreed on. But under these circumstances, I think he is to be considered as the prevailing party in the chief matter of dispute. And here, though the extent and mode of relief are not that which he contended for, he is still the prevailing party in the proceedings, and the only decree in the case is in his favor. The duty on the part of the complainant to release his interest in the rest of the farm, after receiving a deed from the town of what was agreed to be conveyed, is a duty admitted virtually in the bill, and not contested nor decreed by the court, except as being a mere conceded consequence or condition of the town's previous release. Again, though the range of proofs here has been very wide, I do not see that any great branch of evidence or argument in the case has been gone into, which was not pertinent and material to the merits, after the unusual lapse of time since the events happened, and the wide circumstantial evidence obliged to be brought to bear on the case, mostly by parol testimony after so many years. The expenses have undoubtedly been large, as the suit has been long pending, and obliged to be sustained or rebutted by such a long series of facts, and such a broad and general range of inquiry. But they must fall, I think, more equitably, where the judgment on the merits has fallen. The facts have, fortunately for the town, turned out to be such as to exonerate the town from any further important obligation in point of labor or expense, it being only the giving of a deed. Yet it is an obligation involving in principle the whole title of David Hunter and his heirs to all which they were to receive under the contract that has been broken, and which was denied in the answer, and has been resisted in argument. The usual costs, then, are to be allowed to the complainant, and if a difficulty occurs in the taxation, let it be referred to the same master to whom the reference was made concerning the deeds to be executed.

═══

HUNTER (MURDOCK v.). See Case No. 9,941.

HUNTER (PARSONS v.). See Case No. 10,778.